## SIMON v. H. F. WILCOX OIL & GAS CO.
### No. 2292.

Circuit Court of Appeals, Tenth Circuit.
Oct. 23, 1941.

John H. Cantrell, of Oklahoma City, Okl. (Rollin E. Gish, of Oklahoma City, Okl., on the brief), for appellant.

Horace B. Clay and Shell Bassett, both of Tulsa, Okl. (D. E. Martin, of Tulsa, Okl., on the brief), for appellee.

Before BRATTON, HUXMAN, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

The partnership of Simon and McInnis may be hereafter referred to as "Simon," and Harold L. Simon, as administrator of the estate of L. G. Simon, deceased, as "appellant," and H. F. Wilcox Oil & Gas Company as "Wilcox."

As to the first cause of action, appellant accepts the trial court's findings of fact,[1]

[1] "1. The court finds that H. F. Wilcox Oil & Gas Company bought an undivided one-half (½) interest in the oil and gas leases covering Block 6, Chapin and Levy Addition to Oklahoma City, Oklahoma, and a completed well thereon into the tanks, wholly at the cost and expense and sole risk of L. G. Simon and S. P. McInnis, and without cost, expense or risk to H. F. Wilcox Oil & Gas Company by virtue of the agreement dated February 3, 1931, and executed by L. G. Simon and S. P. McInnis as vendors, and H. F. Wilcox Oil & Gas Company as purchaser, a copy of which agreement is attached as Exhibit A to the answer and substituted petition of Harold L. Simon, Administrator of the Estate of L. G. Simon, Deceased; and that H. F. Wilcox Oil & Gas Company acquired said undivided one-half (½) interest in said oil and gas leases and a completed well thereon into the tanks on February 3, 1931, the date of said agreement.

"2. The court finds that L. G. Simon and S. P. McInnis for a valuable consideration and pursuant to said agreement of February 3, 1931, made, executed and delivered an assignment of oil and gas lease dated February 3, 1931, of that certain community oil and gas lease dated September 26, 1930, between Leon P. McCornack, et al, lessors, and Glenn J. Smith, lessee, and of that certain community oil and gas lease dated January 29, 1931, between B. E. Chapin, et al, lessors, and Glenn J. Smith, lessee, covering the following described property situated in Oklahoma County, State of Oklahoma, to-wit: 'All of Block Six (6) in Chapin and Levy's Addition to Oklahoma City, Oklahoma, and that irregular shaped plot of ground lying East of Block Six (6), Chapin and Levy Addition to Oklahoma City, and East of the center line of Lightening Creek, described by metes and bounds as follows, to-wit: Beginning at the Southeast Corner of Block 6, thence in a Northeasterly direction to the Northeast corner of Block Six (6); thence East a distance of 45 feet to the center of Lightening Creek; thence South and Southwesterly along the center of Lightening Creek to a point which intersects with the South Line of Block Six (6) produced East; thence West a distance of 25 feet to the point of place of beginning, continuing .34 of an acre more or less', which assignment conveyed an undivided one-half (½) interest in the above described lease, together with all personal property used or obtained in connection therewith, to H. F. Wilcox Oil & Gas Company, said assignment being recorded February 6, 1931, in Book 169, page 336, in the records in the office of the County Clerk of Oklahoma County, Oklahoma.

"3. The Court finds that L. G. Simon and S. P. McInnis for a valuable consideration and pursuant to said agreement of February 3, 1931, made, executed and delivered an assignment of oil and gas lease dated February 3, 1931, of that certain community oil and gas lease dated September 26, 1940, between Leon P. McCornack, et al, lessors, and Glenn J. Smith, lessee, and of that certain community oil and gas lease dated January 29, 1931, between B. E. Chapin, et al, lessors, and Glenn J. Smith, lessee, covering the land described in the preceding paragraph, in so far as it covers an undivided one-half (½) interest in the above described land, together with all personal property used or obtained in connection therewith, to H. F. Wilcox Oil & Gas Company, said assignment being recorded February 6, 1931, in Book 169, page 337, in the records in the office of the County Clerk of Oklahoma County, Oklahoma; that said assignment contains the following covenant: 'This assignment is made in accordance with and subject to the terms of a certain oil purchase agreement made on the even date hereof, and between the parties hereto;' and that said assignment was so made, executed and delivered by L. G. Simon and S. P. McInnis to H. F. Wilcox Oil & Gas Company to secure the performance of said agreement of February 3, 1931, and to prevent L. G. Simon and S. P. McInnis from selling said undivided one-half (½) interest in said community oil and gas leases to third parties before the completion of said well into the tanks by them as provided in said agreement of February 3, 1931.

"4. The court finds that L. G. Simon and S. P. McInnis, for a valuable consideration, made, executed and delivered an assignment of oil and gas lease dated February 13, 1931, of the certain two community oil and gas leases described

not presenting here evidence other than as appears from the face of the contract,[2] pleadings, and facts as found, and insists that reversible error is apparent.

The record contains the evidence relative to the sale and purchase by Wilcox.

Only questions as to the First and Fourth causes of action are presented on this appeal.

 Wilcox contends that the contract when construed from its four corners in the light of performance by the parties in the two preceding paragraphs in so far as they cover all of their undivided one-half (½) interest in and to said oil and gas leases together wtih all personal property thereon or used in connection therewith, to H. F. Wilcox Oil & Gas Company, subject to an overriding interest in a one-fourth (¼) interest in said leases reserved to Glenn J. Smith in an assignment of oil and gas lease dated February 2, 1931, and recorded in Book 151, page 584 of the records of Oklahoma County, Oklahoma; and that said assignment contains the following covenant: 'This assignment is made for the purpose of securing H. F. Wilcox Oil & Gas Company for certain advances made to L. G. Simon and S. P. McInnis, and is to be re-conveyed to them when such advances have been repaid in full.'

"5. The court specifically finds that the issue of $100,000 par value of Class A Preferred Stock by H. F. Wilcox Oil & Gas Company to L. G. Simon and S. P. McInnis or their nominees, as provided by the terms of said agreement of February 3, 1931, was a legal and valid issue of said Class A Preferred Stock by H. F. Wilcox Oil & Gas Company under the laws of both the State of Delaware and the State of Oklahoma; and that said agreement of February 3, 1931 was fully performed by H. F. Wilcox Oil & Gas Company by the delivery of said stock to L. G. Simon and S. P. McInnis or their nominees, and that said stock was paid for by L. G. Simon and S. P. McInnis by the delivery of the assignment of an undivided one-half (½) interest in the oil and gas leases and the oil as provided in said agreement of February 3, 1931, to H. F. Wilcox Oil & Gas Company.

"6. The court specifically finds that the agreement of February 3, 1931, is a legal and valid contract for the purchase of an undivided one-half (½) interest in an oil and gas lease with a completed well thereon into the tanks and a portion of the oil to be produced from said well, wholly at the cost, expense and sole risk of the vendors, and without cost, expense or risk of the purchaser, and that said agreement of February 3, 1931, is not a loan contract."

2 "Whereas, vendors are the owners of good, valid and subsisting oil and gas mining leases covering the following described real estate in Oklahoma County, Oklahoma, to-wit:

"Block Six (6), Chapin and Levy Addition to Oklahoma City, containing 2.75 acres, hereinafter designated as Tract One, and a tract of land lying contiguous to and immediately east of Block Six (6), and west of the middle line of Lightening Creek, described by metes and bounds as follows, to-wit:

"Beginning at the Southeast corner of Block 6, thence in a northeasterly direction to the Northeast corner of Block Six (6); thence East a distance of 45 feet to the center of Lightening Creek; thence South and Southwesterly along the center of Lightening Creek to a point which intersects with the South line of Block Six (6) produced East; thence West a distance of 25 feet to the point or place of beginning, containing .34 of an acre, more or less, hereinafter designated as Tract Number Two, upon which above described real estate vendors are desirous of drilling a well for oil and gas, and are desirous of selling an undivided interest therein and the oil produced therefrom to purchaser on the terms and conditions hereinafter prescribed.

"Whereas, purchaser is desirous of purchasing an undivided interest in the above described leasehold estate and the oil produced therefrom from vendors on the terms and conditions hereinafter prescribed.

"Now, Therefore, the premises considered, and in consideration of the sum of One Dollar ($1.00) and other good and valuable considerations this day in hand paid by purchaser to vendors, receipt of which is hereby acknowledged by vendors, it is hereby mutually agreed and understood by and between vendors and purchaser as follows, to-wit:

"(1) That vendors shall sell to purchaser, and purchaser shall buy from vendors an undivided one-half (½) interest in the seven-eighths (⅞) working interest of said above described leasehold estate and the oil produced therefrom in the amounts and on the price basis per barrel hereinafter set forth; and simultaneously with the execution of this agreement vendors shall make, execute and deliver to purchaser said undivided one-half interest in the

thereto discloses a sale made by Simon to Wilcox of an undivided one-half interest in said lease, with a completed well and oil therefrom of the value of $100,000 at a price provided for in the contract, for a consideration of $100,000 of par value Class A Preferred stock of Wilcox. The word "advance" in Paragraph 3 as used in connection with other provisions reasonably means in light of context and conditions then existing and surrounding circumstances and acts of all parties in its mutual performance that Wilcox as purchaser is to furnish said preferred stock in stipulated parts as a consideration therefor, said purchaser to own an undivided one-half interest in the rig, all casing, material, appliances, and other equipment in the well or used in connection therewith, except the drilling tools and the oil as stipulated to be received by purchaser, the vendor (Simon) and purchaser (Wilcox) seven-eighths working interest of said above described leasehold estate.

"(2) That vendors shall immediately commence the drilling of a well for oil and gas on said above described leasehold estate at a location thereon selected by vendors, and said well shall be drilled by vendors at their own and sole risk and expense, and without risk or expense to purchaser, to a depth sufficient to test the deep oil producing sands in the vicinity of said leasehold estate, found at approximately 6,500 feet, unless oil or gas is found in paying quantities at a lesser depth, and said well shall be drilled in a good and workmanlike manner, and shall be completed into the tanks with all due diligence and without any unnecessary delay, unavoidable accidents alone excepted, wholly at the cost, expense and sole risk of vendors, and without cost, expense or risk to purchaser.

"(3) That purchaser shall pay to vendors the consideration for said undivided one-half interest in the seven-eighths working interest of said above described leasehold estate and the oil produced therefrom, in the amounts hereinafter set forth in the form of Class A Preferred Stock of purchaser in the total amount of $100,000 par value, and purchaser shall advance said preferred stock to vendors in the following amounts: $15,000 par value of said preferred stock simultaneously with the execution of this agreement; $10,000 par value of said preferred stock when said well is drilled to a depth of 3,000 feet; $20,000 par value of said preferred stock when the nine inch casing is set in said well; $20,000 par value of said preferred stock when said well with an open hole 6⅝ inches in diameter is completed into the tanks; and $35,000 par value of said preferred stock as and when required by vendors for the purpose of acquiring casing, tanks and other equipment in the drilling and completion of said well as aforesaid.

"That such preferred stock in the several accounts above indicated shall be advanced by purchaser to vendors upon evidence sufficient to purchaser of the drilling and completion of said well as aforesaid, and upon the presentation by vendors of bills of expenses incurred for casing, tanks and other equipment in the drilling and completion of said well, but in no event shall purchaser advance more than $100,000 par value of said preferred stock of vendors, and any additional sums of money as are required to complete said well into the tanks as aforesaid, shall be furnished by vendors, and vendors shall complete said well into the tanks as aforesaid, free and clear of any liens or encumbrances of whatsoever character, and that all labor, bills and other expense incident thereto shall be paid.

"(4) That purchaser shall receive out of the first three-fourths of the seven-eighths working interest oil produced from the above described leasehold estate, oil in sufficient quantities to repay purchaser said total amount of $100,000 par value of said preferred stock advanced to vendors as aforesaid, computed on the price hereinafter set forth. That when sufficient quantities of oil produced from said above described leasehold estate have been delivered to purchasers or sold and the proceeds thereof delivered to purchaser to reimburse purchaser the total amount of $100,000 par value of said preferred stock, then vendors and purchaser shall each own an undivided one-half interest in the seven-eighths working interest of said above leasehold estate, and thereafter vendors and purchaser shall divide the expense of operation and the other development, if any of said premises, equally.

"Oil received by purchaser under this agreement shall be credited against the said sum of $100,000 par value of said preferred stock advanced to vendors as aforesaid, at the basis price of Sixty Cents (60¢) per standard barrel of 42 gallons, provided, however, that should the posted market price for oil of like gravity be reduced, then for every ten cents (10¢) said posted market price

each to own an undivided one-half interest in the said lease and divide the operating expenses equally, this being pertinent as the said oil to be received by the purchaser (Wilcox) was to come from the entire working interest, except the one-fourth theretofore retained by and to go to Glenn J. Smith. Thereafter each party to the contract was to receive oil in proportion to his interest in the lease and bear his proportionate share of the operating expense. As the Wilcox oil was being delivered, the operating expenses were by agreement deducted from the value of all the oil and the remainder credited as a delivery to Wilcox. Paragraphs 7 and 8 cover contingencies that might arise occasioned by delay in the completion of the

is reduced, the price to purchaser shall be reduced five cents (5¢) per barrel; but, in event the posted market price for oil of like gravity be reduced below Fifty Cents (50¢) per barrel at any period under this agreement, then and in that event, purchaser shall pay the posted market price during such period.

"Conversely, if the prevailing market price for oil of like gravity should advance above the present prevailing market price, which is approximately $1.07 for crude oil of 40' gravity and above, then the price to be paid by purchaser hereunder shall advance in like proportion from and above the basic price of 60¢ per barrel and shall correspondingly advance and decrease with the prevailing market price during such period of time as the price to be paid by purchaser under this arrangement is above the basic price of 60¢ per barrel.

"(5) That purchaser at its option shall have the operation of said above described leasehold estate, and may take over such operation at any time after said well shall be completed into the tanks thereon by vendors as aforesaid.

"(6) That oil delivered to purchaser from said above described leasehold estate shall, at the option of purchaser, be delivered to its tank cars f. o. b. at its loading rack at Oklahoma City, Oklahoma, or in the tanks upon said leasehold estate, and if delivered in tanks the customary allowances for strapping tanks shall be deducted from the oil so received by purchaser. That deliveries shall be made in the minimum daily amount of 1,000 barrels of oil with the right to purchaser to take such additional amounts daily as it may desire.

"(7) That in event purchaser, for any reason, should not issue its preferred stock as aforesaid, then vendors shall receive from purchaser in lieu thereof purchaser's note or notes in the aggregate amount of $100,000, bearing interest at the rate of seven per cent (7%) due on or before 10 months after date.

"(8) That in event, for any reason, interest or dividends should be paid on any of the preferred stock herein before said preferred stock is actually earned by vendors by the delivery of oil to purchaser therefor, then such interest or dividends shall be rebated by vendors to purchaser or purchaser may run additional oil from said above described leasehold estate, at the price herein specified, sufficient to repay it for such interest or dividends so paid.

"(9) That purchaser shall own an undivided one-half interest in the rig, all casing, material, appliances and other equipment in the well on said above described leasehold estate, or used in connection therewith, not including, however, the drilling tools.

"That in the event vendors, for any reason, shall fail, neglect or refuse to complete said well into the tanks, as hereinbefore mentioned, then purchaser may, at its option, take over the drilling and completing of said well; and if purchaser undertakes to complete said well; then purchaser shall do so at the expense of vendors, and shall deduct such expense from oil which would be the property of vendors under this agreement, and may use any rig, casing, material, appliances, tools and other equipment placed or caused to be placed on said above described leasehold estate by vendors, free of cost to purchaser to complete said well; and that upon the completion of said well as aforesaid by purchaser, then as consideration therefor going from vendors to purchaser for so completing said well 50,000 barrels of oil from the first oil produced from said above described leasehold estate shall be delivered to purchaser.

"(10) That in event vendors should assign interests in said above described leasehold estate to other parties in excess of five in number, then vendors shall have a trustee appointed in connection with said assignments to represent said interest-holders and purchaser may deal with said trustees as the accredited representative of said interest-holders, and the acts of such trustee shall bind such interest-holders represented by such trustee.

"(11) That this agreement shall be binding upon and shall inure to the parties hereto, their heirs, executors, administrators, personal representatives, successors and assigns."

well and preferred stock not being issued as contemplated, and that the sale should be so perfected between vendor and purchaser.

No question is raised in the issues as to the unreasonableness of the contract.

Parol evidence was admitted to assist in its interpretation. One of the original parties, Simon, being dead, McInnis, surviving partner, testified in detail to the circumstances surrounding its making, and that both he and the deceased Simon understood that the contract was one of sale and that they were selling a one-half interest in the lease, with a completed well, including $100,000 of oil to be produced therefrom, subject to Glenn J. Smith lessee's interest, and that they neither intended or expected to procure a loan from Wilcox nor approached Wilcox for a loan, and that prior to the trial he sold his undivided one-fourth interest to Wilcox.

Evidence on part of Wilcox, through Dye, its Vice-President, at time of making the contract, was that Wilcox did not make a loan but bought an undivided one-half interest in and to the lease and working interest and an exclusive ownership of $100,000 in oil, and had always so claimed, and that such ownership was set up as the property of Wilcox on its books. None of these witnesses had any connection with Wilcox at the time of the trial.

The pleadings as introduced in evidence, verified by the deceased Simon, contain statements that by the contract Wilcox bought a one-half interest in said lease, and that said L. G. Simon was the owner of a one-fourth interest therein.

The contention here of appellant is opposite to what the parties mutually intended and understood the contract to be at the time it was entered into.

McInnis and Dye, the Vice-President of Wilcox, who testified, were both before the court, who had opportunity to weigh their evidence and capabilities.

The verified statements of L. G. Simon in the pleadings made by him whilst living harmonize with the interpretation placed upon the contract by said McInnis and Dye.

■ This contract, made and to be performed in Oklahoma, its interpretation is to be determined by the laws of that state. Brown v. Ford Motor Co., 10 Cir., 48 F.2d 732.

■ The practical interpretation of an agreement by a party is a consideration of great weight. Commercial Standard Ins. Co. v. Remer, 10 Cir., 119 F.2d 66; Brooklyn Life Ins. Co. v. Dutcher, 95 U.S. 269, 24 L.Ed. 410.

The whole of a contract is to be taken together so as to give effect to every part of same if reasonably practicable,[3] and be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as the same is reasonably ascertainable and lawful.[4]

■ In construing an ambiguous instrument, the court should place itself as far as reasonably possible in the position of the parties when the contract was entered into, and consider same as drawn and its purposes. American Nat. Bank v. Hensley, 170 Okl. 109, 39 P.2d 34.

■ The contract was performed on the theory that it was a sale and purchase agreement by which Wilcox had acquired a one-half interest in the lease, with a well to be developed, and to receive $100,000 in oil as measured in the contract.

The trial court so found and also found that the transaction was not a loan. Its findings are based upon substantial evidence.

Simon needed a string of casing in the drilling of the well, the cost value of which was $8,000, and which was procured for him by Wilcox. Simon executed a note to Wilcox for said $8,000 and put up $15,000 of par value Class A Preferred stock of Wilcox to secure same. When the note fell due, Simon failed to pay same, which was extended twice by renewal, and after continued default in payment, Wilcox proceeded to sell the pledged collateral. L. G. Simon was absent from the state and his address was unknown and not available to Wilcox. Notices of the sale were posted, as required by the laws of Oklahoma, and a notice deposited in the postoffice, addressed to L. G. Simon in care of his brother. The note provided that Wilcox " * * * if the highest bidder therefor,

3 R.L., Okl.1910, Sec. 951, Okl.Stat. 1931, Sec. 9465, Title 15 Okl.St.Ann. § 157.

4 R.L., Okl.1910, Sec. 946, Okl.Stat. 1931, Sec. 9460, Title 15 Okl.St.Ann. § 152; Carder v. Blackwell Oil & Gas Co., 83 Okl. 243, 201 P. 252; Continental Supply Co. v. Levy, 121 Okl. 132, 247 P. 967; Brown v. Coppadge, 54 Okl. 88, 153 P. 817; Wall v. Chapman, 84 Okl. 114, 202 P. 303.

whether at public or private sale, is expressly authorized and permitted to become the purchaser of said collaterals or any part thereof at any such sale or sales; * * *."

The sole contention of appellant is that the disposition and purchase of this stock by Wilcox at such sale violated the public policy of the state of Oklahoma. Appellant conceded that it was a public sale under such notice as the law required.

A pledgee or pledgeholder may purchase the property pledged by direct dealing with the pledgor in good faith.[5]

A pledgee may foreclose the right of redemption by judicial sale under the direction of a competent court, and in that case he may be authorized by the court to purchase at the sale.[6]

Sale by pledgee of property pledged must be at public auction in the manner and upon the notice to the public usual at the place of sale in respect to auction sales of similar property and be for the highest obtainable price.[7]

In Ardmore State Bank v. Mason, 30 Okl. 568, 120 P. 1080, 1084, 39 L.R.A.,N.S., 292, it was held that had McLish, a stockholder of an Oklahoma state bank "at the time he made the pledge of stock been indebted to the issuing bank, he would have had no right to, nor could he have waived such notice to the detriment of the issuing bank, and the lien created by statute against the stockholder in favor of the bank would have been sufficient to protect the bank as against the pledgee," but he was not indebted to the bank and waiver of such notice was sustained.

However, appellant contends that such waiver may take place only after default and when incorporated in the pledge contract is void.

Contracts are unlawful which are contrary to an express provision of law or the policy of express law.[8]

Notice of sale may be waived by pledgor at any time but is not waived by a mere waiver of demand of performance.[9]

Appellant does not question the regularity of the sale proceedings, if any one other than Wilcox had purchased at such sale.[10]

The Oklahoma statutes herein cited were borrowed by Oklahoma from the Dakota Territory Code, which were carried forward by the legislature of the state of North Dakota into its Code and construed by its Supreme Court in Reeves & Co. v. Bruening, 16 N.D. 398, 114 N.W. 313, 314, in which it is said: "'Why should it be held that by this is meant that the pledgee or pledge holder can only purchase by taking a direct transfer from the pledgor? The statute does not say so, and the reason of the prohibition suggests the contrary. If the pledgor chooses to do so, we see no reason why he may not consent that the pledgee may buy at the public sale. In some cases it may be to his interest that this be done. Such consent may be given either at the time of making the pledge or at any subsequent time, without changing the form of the original contract and without consideration.' Such we also understand to have been the general rule relating to foreclosure sales of pledged property, in the absence of a statute to the contrary. The rule is stated thus: 'The law does not permit the pledgee to become a purchaser of the property pledged at his own sale. Such a purchase is contrary to the principle that forbids a party to purchase property when he has a duty to perform with reference to such property, which is inconsistent with the character of the purchaser.' * * * "

See, also, 21 R.C.L. 694; 49 C.J. 1008; 76 A.L.R. 716.

[5] R.L., Okl.1910, Sec. 4523, Okl.Stat. 1931, Sec. 11716, Title 55 Okl.St.Ann. § 24, Dak.Terr.Stat.1887, Sec. 4416.

[6] R.L.Okl.1910, Sec. 4524, Okl.Stat. 1931, Sec. 11717, Title 55 Okl.St.Ann. § 25, Dak.Terr.Stat.1887, Sec. 4417.

[7] R.L.Okl.1910, Sec. 4518, Okl.Stat. 1931, Sec. 11711, Title 55 Okl.St.Ann. § 19, Dak.Terr.Stat.1887, Sec. 4411; Abraham v. Builders' Material Co., 115 Okl. 141, 242 P. 205.

[8] R.L.Okl.1910, Sec. 972, Okl.Stat.1931, Sec. 9486, Title 15 Okl.St.Ann. § 211, Comp.Laws, Dak.Terr.1887, Sec. 3577.

[9] R.L.Okl.1910, Sec. 4516, Okl.Stat. 1931, Sec. 11709, Title 55 Okl.St.Ann. § 17, Comp.Laws, Dak.Terr.1887, Sec. 4409.

[10] In appellant's brief it is stated:

"We would not question the regularity of the sale proceedings if someone other than Wilcox had purchased the stock at the sale. But those proceedings were wholly insufficient under the statutes to render the sale valid, or to support it as a valid sale in light of the fact that Wilcox became the purchaser of the stock at the sale."

Burke v. Tarrant Inv. Co., 166 Okl. 179, 26 P.2d 949, in light of its syllabus, is in harmony with the conclusion here reached.

The renewal note which was a second renewal was dated March 18, 1932, to which was attached the Class A Preferred stock of Wilcox, the sale of which is in question, and which contained the clause heretofore set out.

Under the Oklahoma statute, "every person having an interest in property subject to a lien, has a right to redeem it from the lien, at any time after the claim is due, and before his right of redemption is foreclosed." [11]

The court found that "the sale was made after due notice was mailed to L. G. Simon at his last known postoffice address in Tulsa, Oklahoma, and was posted in Tulsa, Oklahoma in accordance with the laws of the state of Oklahoma, and that the whereabouts of said L. G. Simon could not be ascertained, but actual notice of said sale was given to Charles N. Simon, the legal representative of L. G. Simon, prior to said foreclosure sale of said stock, and that such notice was in compliance with law; that the sale of said stock to pledgee was for an adequate consideration, and that the foreclosure proceedings relative to the sale of said stock was valid, and that said transaction was inclusive and vested good title to said stock in H. F. Wilcox Oil & Gas Company." Said findings were sustained by substantial evidence. Guilford Const. Co. v. Biggs, 4 Cir., 102 F.2d 46.

The judgment of the lower court is affirmed.

[11] Okl.Stat.1890, Sec. 3306, R.L.Okl. 1910, Sec. 3839, Okl.Stat.1931, Sec. 10952, Title 42 Okl.St.Ann. § 18, Comp. Laws, Dak.Terr.1887, Sec. 4338.