No. 26,538.

Albert Rogers, *Appellee*, v. The Fraternal Aid Union, *Appellant*.

### SYLLABUS BY THE COURT.

Mutual Benefit Insurance—*Breach of Warranty—Sound Bodily Health*. In an action by the beneficiary of a certificate issued by a fraternal insurance society which had been delivered to the deceased the night before her death upon her express warranty that she was then in sound bodily health, when in fact at that time and for thirty days to six weeks prior thereto she had a physical ailment, probably of the nature of a uterine hemorrhage, which caused an almost continuous flowing, and where the medicine she had been taking therefor was causing her to grow steadily worse, and where, at and prior to the time she so warranted her sound bodily health, she had then actually engaged two physicians to perform a surgical curettement on her person for the relief or cure of that ailment, and was to undergo that operation the following day, in which operation she died, her warranty of sound bodily health was breached as soon as made; and her beneficiary cannot recover on the certificate of insurance delivered to her on the faith of such warranty.

Appeal from Sedgwick district court, division No. 2; Thornton W. Sargent, judge. Opinion filed December 11, 1926. Reversed.

*George R. Allen,* of Kansas City, *C. A. Matson* and *I. H. Stearns,* both of Wichita, for the appellant.

*J. W. Ward, Tom Harley, Robert C. Foulston* and *George Siefkin,* all of Wichita, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This was an action on a fraternal insurance policy. Plaintiff's wife, Juanita Rogers, twenty-one years old, and mother of two children, made application on May 27, 1923, for membership and insurance in the defendant institution. She was asked the usual precautionary questions. Some of these and her answers thereto read:

"20. Are you of sound body, mind and health, . . . ? A. Yes. . . .

"12. Have you in the past five years been treated by or consulted any physician in regard to personal ailment? No. . . .

"15. . . . If applicant is a woman . . . how many miscarriages? None. Are you pregnant? No."

These questions and answers were incorporated in her written application, and that instrument also contained the following recitals:

Mutual Benefit Insurance, 29 Cyc. pp. 69 n. 35, 86 n. 90, 87 n. 91, 90 n. 10, 257 n. 37; 40 A. L. R. 662; 14 R. C. L. 1069.

"I hereby waive all benefits paid under the laws of the order, in event of my death or disability resulting directly or indirectly from my being pregnant at this time. I hereby also waive all benefits under the said laws on account of any disability or death occurring to me as a result of abortion or attempted abortion. . . .

"I further agree for myself and my beneficiary, or beneficiaries, that no right to or claim for benefits of any nature shall accrue by virtue of this application or benefit certificate issued thereon *until* the same has been approved by the supreme physician, and *I have* been initiated and *had delivered to me personally,* by the local lodge secretary, *a benefit certificate, accepted by me in writing while in sound health,* free from disease." [Italics ours.]

The defendant's constitution and by-laws which governed the insurance contract contained these provisions:

"SECTION 48. . . . No liability upon the part of this association for the payment of any death or disability benefits shall arise or be incurred until . . .

"Second. Has been initiated. . . .

"Fourth. Had delivered to him, while in good health, his benefit certificate. . . .

"SECTION 55. . . . If the statements, declarations or warranties in his application for membership . . . shall be found in any respect untrue, his certificate shall become and be null and void and of no effect."

On the evening of July 14, 1923, Mrs. Rogers and her husband called on defendant's local secretary and paid the first monthly assessment of dues exacted by defendant from its insured members; and although she had not yet been initiated as a member of the society, the insurance certificate was delivered to her upon her written acceptance which reads thus:

"I hereby accept certificate No. 259,360, delivered to me this 14th day of July, 1923, subject to all the conditions and provisions thereof. . . . *I further declare and warrant that I am in sound bodily health* and of temperate habits. [Italics ours.]                    MRS. JUANITA ROGERS."

The next day Mrs. Rogers died on an operating table in her own home while undergoing a surgical operation called a "curettement" for the correction or cure of uterine hemorrhage.

Payment of the policy being refused, this action by the husband as designated beneficiary was begun.

Defendant's answer set up various defenses which provoked a sharp contest in the trial court. There was testimony which tended to show that Mrs. Rogers was *enciente* when she signed her application on May 27, and that she had sounded a physician about getting relief therefrom. This doctor testified:

Rogers v. Fraternal Aid Union.

"I remember Juanita Rogers. . . . , I had occasion to administer to her in 1923; must have been two or three months before her death. . . . She complained to me of a cold and nauseated. There was no examination made otherwise than a few simple questions. . . . The questions that were asked elicited the fact that there was a possible pregnancy, and that this nausea and vomiting was possibly due to the condition of pregnancy. I gave her something for her cold and made an effort to check the nausea. Nausea could have been due to pregnancy or to other causes. In my judgment it was caused by pregnancy. She stated if she was pregnant she wished she would not have it. I just laughed at her and said, Well, do not come to me for it."

One matter of controlling importance was the deceased's condition of health at the time she made her application for insurance, and especially at the time she gave her receipt for the insurance certificate the night before her death. Her husband, this plaintiff, testified:

"Prior to July 14 or 15, 1923, my wife was apparently in perfect health as far as I know. We would go out and play ball and run around and cut up all the time. There was no apparent change in her health immediately before her death or any time during the two years. . . . [July 14 we] went over to Mr. Shepard's house and got our policies. It is my wife's signature to exhibit 1, signed by her on the day before her death at about eight o'clock in the evening. We took the policies back over to the house and then ran for the street car to go to town and seen the last show at the Miller and had to run to catch the Harry Street street car. Ran nearly a block, I ran, but she outran me. I used to run 100 yards in 10% seconds, but could not catch my wife to the street car. She seemed to have better wind than I had, because I was puffing and she was not. . . . She seemed to be active. She would get out and play ball in the front yard, cutting up all the time like kids; get in a little wagon like kids and coast up and down the street with them."

However, plaintiff also testified to this effect:

"Her menstrual periods were regular until about thirty days before she died, and then she began to flow. She would flow for a day and then quit, and flow of a night and quit. I kept telling her she ought to see a doctor. . . . On July 11th I came down here. I told her to call the doctor. She called Doctor Smith, and she gave her some medicine and she went to Cookson's and got it; she took this medicine three times. I heard Doctor Smith say, 'If this medicine doesn't do you any good I will have to curette you.' It was on the day she prescribed the medicine. The medicine was for menstruation. It did not inconvenience her, but I was worried about it, and knew it was not right why she was flowing that way. I insisted on calling a doctor. I noticed the medicine made her worse. . . .

*"Cross-examination:*

" . . . I noticed she began flowing about thirty days before her death. It started about the regular time to start, but never stopped. About the *first of June* I did not think it was natural; she said, 'I am not worrying about

it, because I am feeling all right.' Talked to Doctor Smith about July 11; she said if it did not stop there would have to be a curettement. She came down to our house at that time. The prescription was made out and she got it filled at Cookson's; she went up herself and got it, and on July 11 the medicine seemed to make her worse; she was flowing harder, and that flowing continued in intensity up to the time of her death."

### Plaintiff's stepmother testified in his behalf:

"I am a practical nurse. . . . I went over to her house on Sunday morning. She called me on the phone, said she wanted me there through a curettement. . . . When I arrived she said she was going to have a curettement; said there was something wrong, and the doctor said she had to have it. . . . She did not tell me she had been flowing. I knew it was a curettement, and as a practical nurse I knew what a curettement was for. Knew it was to stop flowing and remove any foreign tissue that might be in the uterus. She did not tell me what caused the flowing or the dead tissue in the uterus, and I did not ask her. . . . I did not see how much dead tissue was removed; I have no idea; I wouldn't say, I couldn't say. It just came out, washed out, just a mass of stuff."

### Doctor Gouldner, a witness for plaintiff, testified:

"Many women flow during the menstruation periods irregularly and for some periods of time without being in bad bodily health. A prolonged flow which has been going on for over four weeks is self-evidence as to some disturbance of the normal health."

### Doctor Smith testified:

"She called me over the telephone in the morning of Saturday the 14th, the day before the operation. . . . Then she called me again . . . and asked me to make arrangements with some physician to do the surgical work, . . . also talked to Doctor Bernstorf. . . . I told her I had made arrangements with Doctor Bernstorf to do this for her. . . . Her aunt was there, Mrs. Lee, and assisted us in getting her ready for her operation. Mrs. Lee was a domestic nurse and was there as a nurse."

The jury returned a verdict for plaintiff and answered certain special questions submitted by the court:

"1. On what date do you find the insurance policy involved in this case was delivered? A. July 14, 1923.

"2. What date do you find the application was signed by Juanita Rogers? A. May 27, 1923.

"3. Did Juanita Rogers consult Dr. H. P. Daniels in the early spring of 1923? A. Yes.

"4. Did Juanita Rogers about three months prior to her death consult Dr. H. P. Daniels as a physician concerning her ailments, if any? A. Yes. . . .

"7. Was Juanita Rogers pregnant on May 27, 1923? A. No.

"8. Did the death of Juanita Rogers result directly or indirectly from her pregnancy? A. No.

Rogers v. Fraternal Aid Union.

"9. What do you find the death of Juanita Rogers resulted from? A. Chloroform not properly administered as an anesthetic. . . .

"17. Was said Juanita Rogers of sound mind, body and health . . . on May 27, 1923? A. Yes.

"18. Had said Juanita Rogers consulted any physician regarding her personal ailment within five years immediately preceding May 27, 1923? A. Yes.

"19. If you answer the foregoing question in the affirmative, then state what physician and when she so consulted the physician and for what purpose? A. Doctor Daniels about April, 1923, for a cold. Doctor Smith about January and April, for a cold."

Other significant findings read:

"20. Was said Juanita Rogers of sound bodily health on July 14, 1923? A. Yes. . . .

"22. Did Juanita Rogers have any physical ailment on July 15, 1923, immediately prior to her death? A. Yes.

"23. If you answer the foregoing No. 22 in the affirmative, then state of what said ailment or ailments consisted. A. Probably uterine hemorrhage. . . .

"28. Did Juanita Rogers call Dr. Orril Smith on July 14, 1923, and make arrangements for the performing of an operation on July 15, 1923? A. Yes.

"29. If you answer the foregoing question in the affirmative, then state what operation was to be performed on July 15, 1923. A. Curettement."

Judgment was entered in plaintiff's behalf.

Defendant assigns various errors, but we shall go directly to the simplest and most obvious of these, since its determination may conclusively settle this lawsuit.

On the night before her death, at the time the beneficiary certificate was delivered to her, and as a condition of that delivery, Juanita Rogers represented and warranted that she was then in sound bodily health. The jury found that such was her condition (No. 20), but that finding was a mere conclusion and manifestly an erroneous one, since findings 22 and 23 are squarely and specifically to the contrary. The two latter findings deal with the specific facts, and are in accord with the testimony adduced in favor of plaintiff. and that she had engaged physicians to perform that operation that Mrs. Rogers was in apparent good health, an athlete, a tomboy, an efficient cook and housekeeper up to the minute she doffed her clothes and donned her gown and kimono and climbed on the operating table, where she died 25 minutes later on that Sunday afternoon, yet the facts of her physical ailment which had afflicted her for some weeks and which necessitated the surgical operation which had been arranged to take place the following day, were developed by the

evidence of plaintiff's own witnesses. Plaintiff and the witnesses in his behalf testified that deceased had been flowing for some thirty days to six weeks prior to her death, that plaintiff was worried about her condition and said she must see a doctor. Plaintiff testified that two or three days before her death the medicine she was taking had made her worse. Moreover, at the very hour Mrs. Rogers set her signature to the acceptance agreement reciting, "I further declare and warrant that I am in sound bodily health," she knew she had been flowing for 30 or 40 days, that she had been taking medicine to relieve that ailment, that the medicine had made her worse, and that her doctor had told her she would probably have to undergo a surgical operation to rectify some derangement or abnormality in her womb, and she knew that her bodily health was then and there so unsound that she was to undergo a surgical operation next day and that she had already engaged two physicians to perform that operation. All these facts, with no evidence to the contrary (and disregarding altogether defendant's evidence to the same effect), compelled the jury to find that Mrs. Rogers did have a physical ailment (finding No. 22), probably a uterine hemorrhage (finding 23) of sufficient gravity to require her to undergo a surgical curettement, and that she had engaged physicians to perform that operation (finding 28)—she knew all this before she warranted that she was in sound bodily health. The surgical operation did disclose the presence of a mass of dead tissue in the uterus. A woman so afflicted must be held as a matter of law to have been of unsound bodily health, and neither the equivocation of witnesses nor the sophistical conclusions of juries can alter that self-evident proposition. Special findings 22, 23 and 28, with the undisputed evidence which supported those findings, make it perfectly clear that the warranty of sound bodily health, given by the deceased on the night prior to her death, was breached as soon as made. By the terms of the certificate of insurance and by the provisions of defendant's constitution and by-laws, there was to be no liability unless the certificate was delivered and accepted by the member "while in good health." The by-laws provided that the certificate should be void in the event of a false warranty. Such a by-law was binding on the assured and her beneficiary. (*Miller v. Knights and Ladies of Security,* 103 Kan. 575, 175 Pac. 397; *Pickens v. Security Benefit Association,* 117 Kan. 475, 231 Pac. 1016; 40 A. L. R. 654 and note. See, also, *Hoover v. Royal Neighbors,* 65 Kan. 616, 70 Pac. 595; *In-*

*surance Co. v. Brubaker,* 78 Kan. 146, 96 Pac. 595; *Glasgow v. Woodmen of the World,* 107 Kan. 354, 358, 191 Pac. 470; *Hiatt v. Woodmen of the World,* 107 Kan. 359, 191 Pac. 492; *Steele v. Woodmen of the World,* 115 Kan. 159, 222 Pac. 76.)

In view of the conclusion just reached, the other errors assigned and argued by appellant—although some of them are rather striking —need not be considered.

The judgment is reversed and the cause remanded with instructions to enter judgment for the defendant.