## WASHINGTON FIDELITY NATIONAL INSURANCE CO v LACEY

Ohio Appeals, 8th Dist, Cuyahoga Co

No 13087. Decided March 27, 1933

Fishman & Levin, Cleveland, for plaintiff in error.

Frank W. Warady, Cleveland, for defendant in error.

LEVINE, J.

Does the evidence disclose that on the date of the issuance of the policy to John Lacey, he was not in sound health?

This term "sound health" has been judicially interpreted in many cases. The trend of authorities is to the effect that the term does not imply absolute freedom from bodily infirmity or tendency to disease. Morrison v Odd Fellows Mutual Life Insurance Co., 59 Wisconsin 162. "A man may have a sick headache temporarily and still be considered in "sound health" although abstractly considered it is not "sound health" so a man may have an attack of rheumatism—a temporary attack of rheumatism—and abstractly he would not be considered to be in "sound health" and yet, within the meaning of the policy of insurance representing the insured as in "sound health" at the time of his insurance, he would be in "sound health" if it was just a temporary attack of rheumatism. These little infirmities, rather these little attacks of temporary disease, headache or a temporary attack of rheumatism, or some little attack of that kind, are not what is meant by "sound health" because they have no probable bearing upon the insured's life."

Dietz v Metropolitan Life Insurance Co., 168 Pa. 504. "It would be most unreasonable to construe the term "sound health" as used in life insurance, to mean that the insured is absolutely free from all bodily infirmities or tendencies to disease. If this were its true meaning, few persons of middle age could truthfully say they were in "sound health.""

Sievert v National Benevolent Association, 95 Iowa 710. "The term 'sound health' as used in a life insurance policy providing that no obligation is assumed unless insured is in 'sound health' means an absence of disease that has a direct tendency to shorten life."

It must therefore follow that the term "sound health" as used in this policy, upon which recovery is sought, did not signify that the assured was in perfect health, free from all ailments at the time of the issuance of the policy, but relates instead to such organic ailments or diseases as incapacitates the assured in a permanent way from attending to his daily tasks or has a distinct tendency to shorten his life.

The evidence presented in this case as testified to by Fanny Lacey, the wife of the deceased, was to the effect that John Lacey would take sick occasionally and then again he would get well; that he was taken ill about five weeks after the policy was issued to him. Rose Lacey, the daughter of the decedent, stated that her father was taken ill about five weeks after the policy was taken out. None of the witnesses who had a direct contact with John Lacey during his life time, were in any way aware that John Lacey was suffering from Bright's disease. A fair construction of the evidence would indicate that John Lacey, like other people reaching his age, was subject to some temporary discomforts like colds and occasional aches, but that these were of a temporary character; that he was usually attending to his calling as a musician, and that these temporary setbacks such as colds and aches did not interfere with his work. The mere fact that the doctor's certificate states that he died from Bright's disease on October 4, 1931 is not proof that the disease had set in on the date of the issuance of the policy. There is no showing in the record as to the length of time it would take for acute Bright's disease to develop so as to result in death. The testimony of the members of John Lacey's family is to the effect that the decedent, John Lacey, was not taken seriously ill until five weeks after the issuance of the policy. For all we know from the record, the disease denominated "Bright's disease" may have developed entirely since the issuance of the policy. There is not, in our opinion satisfactory evidence that the assured was not, at the time of the issuance of the policy, in "sound health" when applying to said term the judicial interpretation set forth by the authorities above quoted.

As to the defense that "the policy was void for the reason that the applicant had been ill and under medical attention within two preceding years of the date thereof and that the information set forth in the application for the insurance did not contain any statement that he was treated by Dr. Steuer on June 21, 1931," reference must be had to the application:

"15. What is present condition of health? Good.

18. Have you (life proposed) ever suffered from appendicitis, asthma, bronchitis, cancer or tumor, consumption, diabetes, disease of brain, disease of gall bladder, disease of kidneys, urinary organs or liver, fits or convulsions, goiter, heart disease, insanity, lung disease, paralysis, pleurisy, rheu-

matism, spinal disease, spitting of blood, stomach trouble of any kind, syphilis, ulcers or any accidents of any sort. If so give full details. No.

19. What physician have you ever consulted with reference to any ailment? None."

There is testimony in the record that on June 21, John Lacey and the members of his family believed that he was suffering from a cold. The word "ailment" as used in the application, like the term "sound health" must refer to something more than mere passing discomfort.

Sec 9391 GC provides:

"When false answer material: No answer to any interrogatory made by an applicant in his or her application for a policy, shall bar the right to recover upon any policy issued thereon, or be used in evidence upon any trial to recover upon such policy, unless it be clearly proved that such answer is wilfully false, was fraudulently made, that it is material, and induced the company to issue the policy and that but for such answer the policy would not have been issued; and, also that the agent or company had no knowledge of the falsity or fraud of such answer."

The record before us does not clearly prove that the answers found in the application, attributed to John Lacey, were wilfully false; were fraudulently made; that it is material and that it induced the company to issue the policy, and that but for such answers the policy would not have been issued. There is a total absence of evidence in the record that the agent or company had no knowledge of the falsity or fraud of such answers. The provisions of §9391 GC, apparently intended to protect the insured who is generally dependent upon the solicitor against imposition. These questions and answers found in applications for insurance are quite frequently, if not always, drawn by the agent of the company. The insurance solicitor is naturally and normally anxious to get the insurance, and any answers given by an applicant which would prevent the issuance of a policy would materially affect the pecuniary interest of the soliciting agent. The temptation is, of course, very great for the soliciting agent to insert answers which would not disqualify the applicant from obtaining insurance. It is therefore proper and just, as is provided by the code, that the burden should be placed upon the insurance company to show that incorrect answers were wilfully false; were fraudulently made; were material, etc., and also that the agent of the company had no knowledge of the falsity or fraud of the answers. Notwithstanding the provision of the policy which avoids it, "in the event the assured at the time of the issuance of the policy, had been under medical treatment within two preceding years of the issuance of the policy, unless the same is fully set forth in the application," the burden rests upon the company which would defeat recovery to prove that the agent had no knowledge of the falsity of answer No. 19:

"19. What physician have you ever consulted with reference to any ailment?. A. None."

The soliciting agent who secured the application was not called to the witness stand. For all we know, the applicant might have given correct information as to the fact that he was treated by Dr. Steuer on June 21, 1931, and if the agent knew of the fact the company would be bound to pay, notwithstanding the answer to said question, as appears in the application. It was entirely within the range of possibility for the company to have called the soliciting agent who brought the application to its office, to testify to the effect that he did not know of the falsity and fraud of said answer. At least the company should have made a showing in the record as to the reason why the soliciting agent was not called as a witness. Inferences may be drawn from the absence of witnesses when their presence is attainable. It is not beyond the range of probability that in the anxiety of the soliciting agent to get the insurance, he inserted answers other than were given to him by the applicant. He had every pecuniary motive for doing it. The omission by the company to give any reason for not calling the soliciting agent as a witness, would lend probability to such inference. At any rate, in order to defeat a recovery, the company must, under the Ohio law, affirmatively show that neither it nor its agent knew of the falsity or fraud of answers found in the application. It is quite clear from the record that the insurance company did not comply with this burden of proof placed upon it by the code.

We hold that the judgment of the Municipal Court was correct and it will therefore be affirmed.

McGILL, J, concurs in judgment.
LIEGHLEY, PJ, dissents.