## FARMERS & BANKERS LIFE INS. CO. v. BAXLEY.

No. 33287. Sept. 13, 1949.
Rehearing Denied March 21, 1950.

*215 P. 2d 941.*

Champion & Fischl, of Ardmore, for plaintiff in error.

Joe B. Thompson and Kenneth S. Nelms, both of Ardmore, for defendant in error.

CORN, J. Plaintiff, husband and beneficiary, brought this action to recover the face amount ($2,000) of a life insurance policy issued by defendant to his wife, Capitola F. Baxley, upon a non-medical application made through one Bornheim, soliciting agent for defendant's general agent, at Ardmore, Oklahoma, on June 5, 1946.

The policy was delivered June 17, 1946, premiums being paid by the plaintiff. Both the application and the policy contained the usual provision that no liability attached unless the insured was in good health upon delivery and receipt of the policy. Insured had been treated earlier for female disorders. June 26th, she was hospitalized for surgical treatment. Following the operation she returned home, but a peritonital condition developed which continued until her death from an embolus (blood clot) on August 27, 1946.

The soliciting agent was dead at the time of the trial. However, the testimony established that he called at plaintiff's place of business and filled out the application, after asking numerous questions, had the insured sign the application and later returned for further information. The evidence showed insured related a considerable history of female disorders, and advised the agent of two operations for this condition, but he failed to set out in the application certain information given by deceased.

The evidence established that deceased had an operation for uterine prolapse and removal of an ovarian cyst on February 21, 1946, at Frederick, Oklahoma, remaining in the hospital there until about March 1st. Shortly thereafter she and plaintiff moved to Ardmore, and insured consulted Dr. Sullivan, giving him a history of previous disorders and treatment. He treated insured in March and April, and advised her to return in two months. June 11th, six days after signing the application, she again consulted this doctor, and was advised to have an operation to correct a condition diagnosed as stenosis of the cervix. The operation was performed June 26th, and she left the hospital two days later, was returned within 48 hours suffering from peritonisia fever, and although treated for this condition she died August 27, 1946. There was further evidence that insured had twice been hospitalized for observation for tuberculosis.

The case was tried to a jury and a verdict was rendered for plaintiff. In seeking to reverse the judgment the defendant presents three propositions, the first two of which are:

"Applicant only partly disclosed her physical condition and did not disclose her current medical treatment as of the date of the application, and to that extent allows the insurance company the defense of fraud to avoid the policy."

"Where both the application and the policy itself contain provisions concerning the inability of the agent to waive any material requirements, notice of agent's limited powers is binding upon the applicant when the applicant knows

that erroneous information is being entered by the agent on the application."

Supporting these two propositions defendant argues that the insured did not disclose her true physical condition; and, knowing her own physical condition and past medical history, she likewise knew and did not object that the soliciting agent was not including such information in her application for insurance.

Consideration of this record reveals sufficient evidence, if true, to establish that the insured gave full and frank answers to all questions propounded by the soliciting agent who, of his own volition, failed to include such information in the application. This matter was fully and fairly presented to the jury by the trial court's instructions, and the jury's finding in this connection resolved the issue in plaintiff's favor. Atlas Life Ins. Co. v. Chastain, 198 Okla. 338, 178 P. 2d 109; National Aid Life Ass'n v. Clinton, 176 Okla. 372, 55 P. 2d 781; Security Ben. Ass'n v. Greenwood, 103 Okla. 284, 229 P. 1061.

Neither do we consider as persuasive defendant's argument under the second proposition. It is urged that the utmost good faith was required of the insured in answering the application questions, and that she knew her condition and the facts of her operation, but did not object that the agent did not include such information in the application. Thus the defendant says that the fraud was as apparent as if she had never revealed her past medical history, since she knew the application was erroneous, but nevertheless signed and submitted same to defendant.

There was no evidence that insured knew the agent did not supply all information given in response to his questions. Upon being advised that she had undergone a previous operation for female trouble the agent told her this was a minor matter and of no consequence. The agent taking the application is the agent of the insurer, and his knowledge is imputed to the company. Atlas Life

Ins. Co. v. Chastain, supra; 29 Am. Jur. Insurance, section 843 et seq.

Where there are no circumstances to arouse applicant's suspicions, and where the applicant reveals a history of previous illness to the agent, who advises applicant same is of no importance, the law does not require the applicant to go further and question the authority or judgment of the agent to decide the question, or whether the information is sufficiently important to merit consideration in the application. Means are available for the insurer to protect itself from such occurrences, without the necessity of seeking to avoid a policy issued upon an application made by its own agent wherein such agent failed to furnish full information to the company.

The most serious question with which we are confronted is whether there was a breach of the contract provision, contained both in the application and policy, that no liability attached to defendant unless applicant was in good health on the date of delivery and receipt of the policy. The policy, delivered June 17, 1946, contained the following:

"After its delivery to and receipt by the insured, while in good health, this policy takes effect as of the fifth day of June, 1946."

The medical testimony as to insured's health and physical condition may be summarized as follows: Dr. Sullivan examined her April 10, 1946, and had her past history of illness and operation. He found her to be getting along well from the operation, but found a condition known as stenosis of the cervix which required dilation. June 11, 1946, he again examined her and found the uterus closed, but her general health was good and he found nothing further wrong. June 11, 1946, he advised her it would be necessary to operate. Such treatment is classed as a minor operation. Two days after the operation she returned home but developed peritonisia fever and returned

to the hospital where treatment was given, but she later developed an embolus and died.

The doctor thought she was in good health in April, and would have passed her for insurance. He would not have passed her on June 11th, as she was not feeling well. He did not know whether the condition which caused her death existed in April or June. Something latent in patient's system caused peritonitis to develop, but this was not due to the condition of the cervix. He was unable to state whether insured was in good health on June 5th, but she was not feeling well on June 11th, and he did not think she was in good health when he advised hospitalization.

Plaintiff's evidence concerning insured's health was elicited from an employee who worked with insured and who had been present when the application was made; from a party who made investigation concerning her health for the Retail Credit Company; and from plaintiff himself. Such testimony was admissible under the rule in Duncan Life & Accident Ass'n v. Ross, 174 Okla. 389, 50 P. 2d 690.

Summarized, this testimony was that insured was an energetic person, who actively assisted in her husband's business (taxicab company) as well as carrying on her duties as a wife and mother; that she looked and conducted herself as a healthy, normal woman, and the soliciting agent had stated she was in good health.

Defendant recognizes the rule that the determination of good health is a question of fact for the jury, where there is competent evidence from which different conclusions might be drawn. National Aid Life & Accident Ins. Co. v. Roberson, 180 Okla. 265, 68 P. 2d 796. And, whether the insured is in fact in good health at the time of delivery of the policy depends upon the facts and circumstances of each case. National Aid Life Ass'n v. Persing, 178 Okla. 522, 63 P. 2d 35, and cases cited.

Judicial definitions of "good health" or "sound health" within the meaning of such policy provisions are as abundant as the decisions considering the problem. In 44 C.J.S., Insurance, section 265 (b), one of the most generally used is as follows:

"The term 'good health' or 'sound health' within the meaning of a stipulation that the policy shall not become operative unless the applicant is in good health at the time of the delivery of the policy, means freedom from any serious disease such as one that affects seriously the general soundness of the system or that has a direct tendency to shorten life."

In Washington Fidelity Nat. Ins. Co. v. Lacey, 45 Ohio A. 104, 186 N.E. 751, it was held that "sound health" did not mean that

" . . . the assured was in perfect health, free from all ailments at the time of the issuance of the policy, but relates instead to such organic ailments or diseases as incapacitate the assured in a permanent way from attending to his daily tasks or have a distinct tendency to shorten his life."

To this same effect see Klein v. Farmers' & Bankers' Life Ins. Co., 132 Kan. 748, 297 P. 730.

Defendant relies strongly upon Home State Life Ins. Co. v. Jennings, 179 Okla. 39, 64 P. 2d 304, and Home State Life Ins. Co. v. Turner, 183 Okla. 575, 83 P. 2d 832, wherein the following rule is announced:

"When a policy of life insurance issued without medical examination contains the provision that 'no obligation is assumed by the company unless on said date the insured is in sound health,' and after lapsation for non-payment of premiums is reinstated 'provided the insured is in good health on this date,' the insurer may avoid liability upon proof that upon date of reinstatement the insured was then seriously afflicted with a fatal malady which continued uninterruptedly and in due course of the disease caused the death of the insured. The insurer is not required to go further and establish that the insured on date of reinstatement knew

that he was seriously afflicted with such fatal malady."

However, attention is directed to Sovereign Camp W.O.W. v. Jackson, 57 Okla. 318, 157 P. 95, L.R.A. 1916F, 166, wherein a temporary indisposition was held not to preclude insured's being in good health on the date the policy was delivered; and Sovereign Camp W.O.W. v. Brown, 94 Okla. 277, 221 P. 1017, cited in the Jennings case, supra, wherein "sound health" was recognized as a comparative term. Also, see the dissenting opinion in the Turner case, supra.

In the instant case there was no showing insured was incapacited from attending her duties. Although the doctor testified he would not have passed her for insurance on June 11th, she was treated and returned to her usual activities until the time of her operation, June 26th. The testimony showed insured to be active, and that she had recovered in a satisfactory manner after her February operation. She was treated for chronic female disturbance and, when the necessity for surgical treatment arose, undoubtedly was advised this was a minor operation, since the physician testified it was so considered. This, combined with her own knowledge that her condition did not incapacitate her in her daily life, negatives the argument that the insured acted in bad faith by not advising defendant of the prospective surgical treatment. In this connection we call attention to our recent holding in National Aid Life Ins. Co. et al. v. Honea, 201 Okla. 41, 202 P. 2d 221, and point out that a situation was presented therein where the insured was suffering from an incurable malady both when he applied for the policy and when applying for reinstatement, but chose to represent himself as being in good health, thus bringing that case within the meaning of the rule of the Jennings case, supra.

To announce that this insured was not in good health as a matter of law because of the necessity which arose for minor surgical treatment of a periodic condition, particularly in the absence of proof that death directly resulted from such condition, would serve only to make it possible for an insurer to avoid every policy of insurance delivered to any woman during a period when she sought minor medical treatment because of periodic disorders. In the absence of fraud or bad faith, we are of the opinion that the policy requirement of sound health does not extend to slight or periodic ailments or disorders.

Although the insured's doctor testified he did not believe her to be in good health when he saw her on June 11th, from the evidence the jury could, and did, determine that her general condition was not such as precluded her from being considered as being in sound health within the terms and conditions of the policy.

Judgment affirmed.

DAVISON, C.J., ARNOLD, V.C.J., and LUTTRELL, JOHNSON, and O'NEAL, JJ., concur. WELCH, GIBSON, and HALLEY, JJ., dissent.

HALLEY, J. (dissenting). The majority opinion in this case is contradictory to the evidence.

The two errors to which I wish to call your attention are:

First, the admission of incompetent testimony over the objection and exception of the defendant. That was the testimony of the witness John E. McCain, wherein he was permitted to testify as to a statement made to him by one Bornheim, who had been soliciting agent of the policy on which the plaintiff based his suit. He testified that Bornheim, who was not a doctor, told him that, as far as he knew, Mrs. Baxley was in good health. This is rank hearsay, and there was no justification on the part of the trial court for admitting such testimony, which would influence the jury in its verdict.

The second and principal error in this case was the court's permitting the case to go to the jury in the face of the evidence that the plaintiff's wife was not in good health on June 17, 1946, the date of the delivery of the insurance policy. The only testimony, other than expert testimony, as to the condition of Mrs. Baxley's health, was that of John E. McCain, who was testifying entirely from hearsay, as he was making a routine investigation as a representative of a credit company, and the testimony of H. A. Darrough, who had been an employee of the plaintiff in the taxicab business. These men were not experts in any way, and could not know about the real condition of Mrs. Baxley's health.

The case of National Life & Accident Ins. Co. v. Whitlock, 198 Okla. 561, 180 P. 2d 647, is very similar to the one at bar. There the insured had tuberculosis at the time of the delivery of the policy, and it was so proven at the trial. The case was permitted to go to the jury and a verdict returned for the plaintiff; and in reversing that case, Justice Osborn had this to say about the non-expert testimony:

"It is clear that the testimony of plaintiff that her husband was in good health was a conclusion, or the expression of an opinion, upon a matter as to which she was not qualified to judge. That was a question which could be determined only by skilled medical practitioners or professional men of scientific ability in the diagnosis and treatment of the disease. It could not be determined from the testimony of unskilled witnesses. Inter-Ocean Oil Co. v. Marshall, 166 Okla. 118, 26 P. 2d 399; Ft. Smith & Western Ry. Co. v. Hutchinson, 71 Okla. 139, 175 P. 922. The general rule is that in cases like the instant case, where the question is whether the insured was in sound health at the time the policy was issued, the liability of the insurer is determined by the actual or real condition of the insured, not by his apparent health, or anyone's belief or opinion as to his health. 37 C.J. 404 §78; Old Surety Life Ins. Co. v. Hill, 189 Okla. 250, 116 P. 2d 910; 40 A.L.R. 662, note. Plaintiff, because of her lack of skill or scientific knowledge, could only testify to her opinion as to his apparent health. Plaintiff's inability to testify as to her husband's real condition is shown in the record, for, when asked if her husband did not die from tuberculosis, she stated that she did not know, that the doctor told her he did."

In this case, the non-expert testimony was not sufficient to take this case to the jury, and the only expert testimony they had was that of Dr. R. C. Sullivan, who testified that Mrs. Baxley came to see him in either March or April of 1946, and at that time she was suffering from a stenosis of the cervix, and at that time her cervix was dilated, causing a great deal of pain and flow for two weeks; that he told her, on or about April 10th, that he was going away on a visit, and for her to come back in a couple of months; that she did come back, and on June 11, 1946, her condition had not improved and her cervix was practically closed, and he told her that an operation was imperative and that she should have that operation immediately after the menstrual period, which would be the 25th or 26th of June. He testified, in answer to questioning by the plaintiff's attorney:

"Q. What causes that monthly opening and closing? A. No, the uterus stays open all the time and the scar tissue contracts, it always contracts, it will pull up, the scar tissue, around the hole and will make the hole smaller, that was what happened. Q. Is this condition a serious malady or disease or is it to be considered as a rather common, ordinary situation among women? A. You mean the stenosis of the cervix? Q. The stenosis of the cervix. A. That is not a common, no, sir, it is an unfortunate occurrence following the treatment, that is a treating of the ulceration. Q. Then does this condition have any serious effect upon her health? By Mr. Fischl, of counsel for defendant: We object to that as leading and suggestive. Q. State as to what effect upon the general health of the patient this kind of a condition would

have. A. If the cervix is completely closed, all of the drainage is stopped and that patient will complain of pain in the lower abdomen and back and will be weak and feel bad and have a loss of appetite."

How could anyone say this woman was in good health when such a condition existed in her body? This is clearly contrary to the rule laid down in National Aid Life Ins. Co. et al. v. Honea, 201 Okla. 14, 202 P. 2d 221.

On cross-examination, the doctor further testified that he would not have passed this woman for insurance on the 11th day of June. Part of his testimony is here set out:

"Q. Doctor, I believe if I understand you properly, you, on April 10th, were making an examination for this lady for the purpose of passing on her for insurance; now if you were making such examination, if you had known at that time that she had these complaints of pain in her side and in her back and if you had followed that up and found out she had this complete stenosis of the cervix, you would not have approved her for insurance at that time? A. No, sir, I wouldn't have passed her that way. Q. You would not have considered her a good risk? A. Not after my complete examination. Q. You would say that is true on the 11th of June, is that right? A. That is when I advised her to have the operation."

Although he had testified, in answer to a leading question by counsel for plaintiff, that she was in good health when he examined her in April and June, he testified definitely on cross-examination that she was not in good health on June 11, 1946:

"Q. From your examination and operation, will you state was the lady in good health on the 5th day of June, 1946? A. I can't answer that truthfully, I just don't know, she came to me on the 11th and wasn't feeling good. Q. Was she in good health on the 11th of June? A. No, sir, she wasn't feeling well then. Q. Of course, a person don't come to the doctor—? A. Unless they are feeling bad."

In his testimony he again reiterated the fact that she was not in good health on June 11, 1946:

"Q. Doctor, is it your testimony that she was not in good health on the 11th day of June, 1946? A. I didn't think she was then because I advised her to go to the hospital, she was feeling bad."

Capitola Baxley was operated on June 26, 1946, and died in August from peritonitis resulting from the operation.

There is no real evidence in this case that this woman was in good health on June 17, 1946, because it is Hornbook principle that testimony elicited by leading question is not entitled to the weight that testimony in answer to a question that is not leading is; and, furthermore, where the plaintiff's witness, on cross-examination, makes statements that contradict his testimony on direct examination, the testimony on cross-examination will prevail. Kessler v. Philadelphia Rapid Transit Co., 107 Pa. Super. 143, 163 A. 393.

The court was without jurisdiction in submitting this cause to the jury. On this question, the case of National Aid Life Ins. Co. v. Honea, supra, is in point, for there must be some evidence to submit to the jury; and as was said in the Whitlock case, supra, lay testimony is not proper in a case of this kind.

The defendant was not liable in this case if the plaintiff's deceased wife was not in good health on June 17, 1946. Here was a woman who had been ailing much of her life, and on the 21st day of February, 1946, she had had a major operation for a prolapsed uterus. She had had a previous operation. We find her going to her physician within 30 to 60 days after the last operation suffering from stenosis of the cervix, to relieve which there had to be an amputation of an internal part of the human body. These undisputed facts, combined with the plaintiff's own medical testimony that this woman was not in good health on June 11th, and that hers was a condition

538

that continued right on up to the time of her operation, are too much for me as an appellate judge to agree that the case should be left to the whim of twelve men, who would naturally be favorable to the plaintiff.

I call attention to the case of Rogers v. Fraternal Aid Union, 122 Kan. 9, 251 P. 408, which was somewhat similar to the one here on the facts. There the deceased insured, at the time she made application for the policy, was afflicted with a physical ailment which was probably uterine hemorrhage, "of sufficient gravity to require . . . a surgical curettement", for which she had already engaged a physician (which operation, when performed, disclosed the presence of a mass of dead tissue in the uterus). The court said:

"A woman so afflicted must be held, as a matter of law, to have been of unsound bodily health, and neither the equivocation of witnesses nor the sophistical conclusions of juries can alter that self-evident proposition."

I have no complaint to make of the rule that has been laid down in this court that it is a question of fact for the jury to determine whether or not the applicant was in good health at the time of delivery of the policy, if there is any substantial evidence to submit to the jury; but when there is no evidence to submit to the jury, and the presumption that is raised by the delivery of the policy has been overcome by evidence that the applicant was not in good health at the time of the delivery of the policy, and the plaintiff has the burden of refuting that testimony, certainly, the plaintiff should not be permitted to recover when he has completely failed to do so. The majority opinion would require a case to be submitted to the jury after rigor mortis had set in.

I respectfully dissent.

No. 33130. Feb. 14, 1950.
Rehearing Denied March 21, 1950.