The NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, a corporation, Plaintiff in Error,

v.

Bessie CUDJO, Defendant in Error.

No. 37164.

Supreme Court of Oklahoma.

Nov. 20, 1956.

Kenneth Abernathy, Robert D. Allen, Abernathy & Abernathy, Shawnee, for plaintiff in error.

· Kenneth B. Kienzle, Shawnee, for defendant in error.· · ·

HALLEY, Justice.

This action was filed by Bessie Cudjo against The National Life and Accident Insurance Company to recover under an insurance policy in which she was named as beneficiary. The insured was her minor son, fifteen years of age, who had died about eleven months after the policy was delivered. The case was tried to a jury which found for the plaintiff and judgment was rendered for the amount of the policy, $1,000, and the defendant has appealed. The parties will be referred to as plaintiff and defendant as they appeared in the trial court.

Some of the undisputed facts are that the plaintiff is a negro woman, 46 years of age, the mother of 15 children, living in Shawnee, Oklahoma, and at the time the policy here involved was applied for and issued, plaintiff carried with defendant a similar policy for herself and for at least one other child in addition to Willis Cudjo, who died December 23, 1953.

There is no dispute but that the agreed premiums were promptly paid to defendant's soliciting agent, H. R. Menasco, who resided in Shawnee and had gone to the home of the plaintiff to collect premiums from her upon other policies at the time he took applications for the policy on Willis Cudjo and another minor son of plaintiff.

It is not disputed that the policy here is a "non-medical" policy, requiring no medical examination of the applicant, and that it contained a provision that "All statements made by the Insured or on his behalf shall, in the absence of fraud, be deemed representations and not warranties", and that no agent "shall have the power or authority to waive, change or alter any of the terms or conditions of this policy," and that it shall not be changed in any manner except by endorsement signed by the President or Secretary. The application was not attached to or made a part of the policy.

The defendant denied in general the allegations of plaintiff and alleged that the insured, Willis Cudjo, a minor, and the plaintiff conspired to secure the insurance

by making false and fraudulent representations in their application to the effect that the insured was then in sound health, and thereby secured the issuance of the policy, and that the insured's health was not sound, but that he was then suffering from a disease which ante-dated the issuance of the policy, rendering it void.

The defendant, plaintiff in error, has submitted a number of propositions. It is contended that the court erred in failing to construe the entire contract between the parties; that when the evidence disclosed that the insured was not in "sound health" when the policy was delivered, the issue of good health or bad health should not have been submitted to the jury; that the evidence does not support the finding that the soliciting agent was informed of the "bad health" of the insured, regardless of whether such information could be deemed to have been imputed to the defendant; that it is inconsistent for the jury to find that the answers appearing on the application are true, and also find the sound health condition, precedent to the validity of the contract, was waived by the soliciting agent; and that the instruction given upon the issue of false representations was contrary to the law.

To avoid repetition we shall not undertake to discuss these propositions separately.

We find no merit in the contention that the court failed to construe the entire contract of insurance, which should generally be construed as any other contract.

Neither do we find that the court ignored provision No. 8 of the policy. Provision No. 8 provides that the policy constitutes the entire contract between the parties and that all statements by the insured, in the absence of fraud, are to be deemed representations and not warranties, and that no agent has the authority to waive or alter the provisions of the policy.

Defendant charged that the plaintiff and the insured conspired to defraud by stating that insured was in sound health when the policy was applied for and delivered, but

it should be kept in mind that Section 197, 36 O.S.1951, provides as follows:

"Any person who shall solicit and procure an application for insurance shall, in all matters relating to such application for insurance, and the policy issued in consequence thereof, be regarded as the agent of the company issuing the policy and not the agent of the insured, and all provisions in the application and policy to the contrary are void and of no effect whatever."

Section 213 of the same Title, also provides that " * * * the statements made in the application shall, in the absence of fraud, be deemed representations and not warranties." The foregoing statement appears in paragraph 8 of the policy and while fraud is alleged by the defendant, we find that it is not sustained by the evidence.

In Commonwealth Life Ins. Co. v. Hutson, Okl., 271 P.2d 722, it is clearly held that a soliciting agent is insurer's agent in taking applications, and that his acts and information received, and acted upon by him in connection with applications, in the absence of fraud, are binding upon the insurer. It was held to the same effect in Globe & Rutgers Fire Ins. Co. v. Roysden, 208 Okl. 660, 258 P.2d 644, 645, and expressed in the second and third paragraphs of the syllabus as follows:

"A soliciting agent of insurer is insurer's agent in taking applications, with power and authority as to such applications, and acts performed or knowledge received and acted upon by him in connection with applications are binding on insurer, in absence of fraud or collusion between agent and applicant."

"Where the questions of fact are submitted to the jury under instructions fairly stating the law applicable to the facts, verdict and trial court's judgment thereon will not be disturbed on appeal."

The question of whether the insured is in "sound health" at the time the policy is delivered is generally held to be for the

jury to decide. In National Life & Accident Ins. Co. v. Wicker, 171 Okl. 241, 43 P.2d 50, 100 A.L.R. 357, it is held that whether insured was in good health at the time of the delivery of an insurance policy depends on circumstances of each case and ordinarily is for the determination of the trier of the facts.

In Duncan Life & Accident Ass'n v. Ross, 174 Okl. 389, 50 P.2d 690, it is announced in the second paragraph of the syllabus:

"Insurer, in action on life insurance policy, asserting that insured was not in good health at time the policy was delivered, has burden of proof, and whether insured is in good health at time of delivery of policy depends upon particular facts and circumstances and is generally question of fact for jury or court."

Again in Farmers & Bankers Life Ins. Co. v. Baxley, 202 Okl. 531, 215 P.2d 941, it was held to the same effect.

Was there competent evidence to support the jury in its finding for the plaintiff? The plaintiff, Bessie Cudjo, was an illiterate negro woman and testified with an apparent frankness that must have impressed the jury that she was telling the truth. She freely admitted that three of her many children were illegitimate and that she was living on "relief." In telling of the occasion when the soliciting agent came to her house and took the application for the policy on Willis Cudjo, her fifteen year old son, she testified as follows:

"* * * So he say, 'Well, I believe I can write insurance on these boys.' And so Willis was the first one that came in. He say 'Well, are these boys in good health?' I said 'Now, this boy here have been to the University Hospital for treatment.' I said 'But have never been in no hospital.' So he looked at him. He said 'I believe I can write insurance on this boy. He don't look like anything was wrong with him.' The boy was laughing and talking and

going on with him. And so he wrote the policy.

\* \* \* \* \* \*

"Q. Now, you say he asked you about whether Willis had ever been under any doctor's care, didn't he? A. Yes, sir.

"Q. Did you tell him about any doctor? A. Yes, I did.

"Q. Who did you tell him about? A. I told him about Dr. Navin coming down to the school checking the boys down there, and he said he had a weak spot somewhere or another about his heart. But I did not know what. And he say he did not know what, because I would have to take him to a higher physician.

"Q. So then you say he wrote the policy? A. That's right.

"Q. This Mr. Menasco? A. That's right.

"Q. Did he tell you what the premiums would be on it? A. He said the premiums would be 49 cents a week, and I paid in advance.

\* \* \* \* \* \*

"Q. Did you tell Mr. Menasco at the time all that you knew about Willis? I mean about him being to a doctor— A. Yes.

"Q. —and being to the hospital? A. I sure did.

"Q. Told him all you knew about it? A. That's right.

\* \* \* \* \* \*

"Q. \* \* \* you told Mr. Menasco when he got your boy's signature on that application that your boy had some kind of a heart condition. Is that your testimony? A. I told him that before he written the policy.

"Q. Yes. Before this application was signed, you told Mr. Menasco that? A. I certainly did.

"Q. And you also told him at that time about Dr. Navin fixing up the papers for you to sign to have the boy

admitted to University Hospital; is that your testimony? A. That's right. I sure did.

"Q. And you also told Mr. Menasco what they told you over at University Hospital, didn't you? A. As far as what they told me, they said something was wrong with his heart, but they didn't know what. And I didn't know what.

\* \* \* \* \* \*

"Q. And you told him that Dr. Navin had said that the boy had a heart condition? A. He said he had a weak spot somewhere.

\* \* \* \* \* \*

"Q. Now, did you tell Mr. Menasco that you took him over there to the hospital? A. Yes.

\* \* \* \* \* \*

"Q. Was that at the time he was writing it out, or before he wrote it out? A. Before."

■ This Court has held many times that where an agent learns from an applicant that he is in bad health, such knowledge is imputable to the insurer. Security Life Ins. Co. v. Woods, 118 Okl. 156, 247 P. 356; Equitable Life Assur. Soc. of U. S. v. Case, 167 Okl. 119, 28 P.2d 571; Farmers & Bankers Life Ins. Co. v. Baxley, supra, and numerous other cases. The testimony to the effect that the agent was informed when he wrote the application that the County Superintendant of Health, Dr. Navin, had examined Willis Cudjo at school in Shawnee is certainly competent and justifies the jury in finding for the plaintiff.

It is difficult to understand why the soliciting agent, after being told that Dr. Navin had found some irregular condition in the boy's heart, did not contact Dr. Navin and verify what the boy's mother had told him; and why the insurance company apparently made no effort to ascertain what his heart condition was after learning that Dr. Navin had recommended to his mother that he be examined at the University Hospital at Oklahoma City. The soliciting agent Me-

nasco denied that he obtained this information when he took the application two weeks before the policy was delivered.

The defendant called Dr. Navin as a witness and also introduced the record of the insured at the Crippled Children's Hospital at Oklahoma City, where Bessie Cudjo had taken her son on the advice of Dr. Navin. The death certificate from the hospital leaves unanswered the question of "Disease or condition directly leading to death?" Dr. Navin testified that he advised the mother of the insured as follows:

"I advised her to take Willis to the Crippled Children's Hospital for examination regarding a murmur which we found at the school examination on September 4th, 1952."

The hospital report showed that an autopsy was performed after the death of the insured on December 23, 1953, and it was found that he died of "rheumatic pancarditis active."

Dr. Navin testified that he would say that Willis Cudjo had a rheumatic heart disease at the time he examined him at the school in September, 1952, but that he could not answer yes or no as to the "rheumatic pancarditis active" at that time because he did not know, but did believe that the boy had a heart condition and for that reason told the mother to take him to the Oklahoma City hospital. Dr. Navin testified further:

"Q. Now, Dr. Navin, when you got through examining this boy, why, your diagnosis was a heart murmur, isn't that right? A. That's right, sir.

\* \* \* \* \* \*

"Q. And you have examined numerous people, have you not, in your practice, and all the training and experience you have had in hospitals, you have examined numerous people with heart conditions such as this boy has had, haven't you? A. Yes.

"Q. And a lot of those people have lived a long time, haven't they, doctor? A. Yes.

"Q. And some of them really end their life, they die of something else, isn't that true? A. That's quite true.

"Q. Yes, sir. A. Quite possible."

The University Hospital records disclosed that there was "no history of rheumatic disease", and Dr. Navin testified that "But they apparently did not consider it active rheumatic fever," and that the insured died of a flare-up or re-activation of rheumatic fever, judging from the history of the case.

We find that proposition No. 5 relative to the alleged error of the court in giving instruction No. 6 has no merit since it fairly states the law as given.

There is undisputed evidence that Willis Cudjo was an active boy in school; that he helped his mother in her work; did janitor work; mowed yards, scrubbed floors, carried heavy loads up stairs and engaged in play around the schoolyard without any evidence that he was suffering from heart disease at the time the application was made, and up to a few weeks before his death.

In view of the fact that there is competent evidence to sustain the finding of the jury to the effect that the defendant had not been deceived as to the health condition of the insured when the policy was applied for and delivered, we find no error in submitting this question to the jury. The evidence of the defendant, introduced through Dr. Navin and the records of the hospital where the insured died, is somewhat in conflict as to the disease that caused his death, and whether such disease existed at the time the policy was applied for and delivered. It is clear that the mother of the insured believed the insured to be in sound health at such times. It is hardly conceivable that the illiterate mother and her fifteen year old son could have conspired to defraud the insurance carrier under all the circumstances surrounding the various incidents disclosed by the record.

We find that the verdict and judgment based thereon are supported by competent evidence and that there was no error sufficient to justify a reversal. The judgment is affirmed.