## EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES v. CASE.

No. 21325.　Dec. 12, 1933.

Rehearing Denied Jan. 9, 1934.

Randolph, Haver, Shirk & Bridges, for plaintiff in error.

Hulette F. Aby, William F. Tucker, and Frank Settle, for defendant in error.

WELCH, J.　This suit was brought by Lavena Case against the Equitable Life Assurance Society of the United States for recovery on a policy of life insurance. Verne H. Bostwick was the insured, and plaintiff, his fiancee, was beneficiary under the terms of the policy sued upon.

On February 24, 1928, the insured, Bostwick, was in the employ of the Greenlease-Moore Cadillac Company of Tulsa as an automobile salesman. At that time the said automobile company had in force with the Equitable Life Insurance Society of the United States a policy of insurance known as a group life insurance policy. This policy insured the lives of the employees of the automobile company for various amounts. The said Bostwick had a certificate of insurance under the terms of said policy, and the amount of insurance there-

under was $1,500. The said Lavena Case, plaintiff herein, was beneficiary under the terms thereof.

On this date, to wit, February 24, 1928, one Leonard A. Abercrombie approached a group of the employees who were insured under the group insurance policy held by the automobile company, and informed them that he was representing the Equitable Life Assurance Society of the United States, and that the said group policy then held by the Greenlease-Moore Cadillac Company would be canceled within a very short time, and that he was anxious for the employees who were insured thereunder to obtain the benefit of the provisions of the group policy, which provided that the said employees might obtain converted policies of life insurance without the necessity of a physical examination. Among the group of employees thus approached by the said Abercrombie with this proposition was the said Verne H. Bostwick. Bostwick inquired of him at the time if it would be possible for him to obtain a converted policy of $5,000 without the necessity of a physical examination, and Abercrombie assured him that it would be. At the same time the said Abercrombie suggested to Bostwick that it was necessary that an application be filled out as a mere formality, and suggested that if Bostwick would only sign the application in blank he would complete the same by filling in the answers to the questions therein contained, to which suggestion Bostwick responded by then and there signing the application in blank. The group policy and the individual certificate issued to Bostwick were canceled March 1, 1928.

A short time thereafter, the said Abercrombie delivered to the said Bostwick the policy of life insurance sued upon, thereby insuring his life in the sum of $5,000, with Lavena Case, respondent herein, as beneficiary. The insured, at the time of the transactions herein above related, was suffering with, and was in the last stages of tuberculosis. A few weeks thereafter he was confined to his bed with this malady, where he remained until in June, 1928, when he died of the disease. Some two or three premium payments were made on the policy and there had been no default in premium payments prior to his death.

The certificate of insurance held by Bostwick when approached by Abercrombie with the proposition above outlined provided in part as follows:

"Termination and Conversion: The insurance of any employee shall automatically cease and determine upon termination of employment with the employer in the specified classes of employees; but in case of such termination of employment for any reason whatsoever while insured, the employee shall be entitled to have issued to him by the Equitable without further evidence of insurability upon application made to the Equitable within thirty-one days after such termination and upon the payment of the premium applicable to the class of risk to which he belongs and to the form and amount of the policy at his then attained age, a policy of life insurance, in any one of the forms customarily issued by the Equitable, except term insurance, in an amount equal to the amount of his protection under such group insurance policy at the time of such termination. For purposes of insurance, re-employment will be classed as new employment."

From this it will be seen that Bostwick had definite rights to continue insurance entirely within his control, regardless of the desires of the insurance company. It is true that under the terms of the individual certificate it is provided that the insured's employment must have been terminated with the automobile company; that he must make application within 31 days from such termination, and that the converted policy of insurance was restricted to an equal amount of insurance as represented by the certificate which he then held, which in this case was $1,500. There is no evidence, however, in the record to show that the insured had knowledge of these conditions. There is evidence from which it may be said that Bostwick desired to retain the benefits of the certificate of insurance which he then held.

The beneficiary, after denial of liability by the insurer, filed her action for recovery against the plaintiff in error, and upon trial to a jury was awarded judgment for the full amount for which she sued, $1,500. The Equitable Life Assurance Society of the United States has appealed, and is plaintiff herein, while Lavena Case, who was plaintiff below, is defendant.

Plaintiff contends, first, that the trial court erred in overruling its demurrer to the petition. This petition pleaded substantially the facts hereinabove enumerated, and waived any right of recovery in excess of $1,500. No motion seeking to clarify the same was filed, and, from an examination thereof, we conclude that it is a sufficient declaration under the $5,000 policy of insurance to the extent of $1,500, upon the theory that the policy was issued in satisfaction of Bostwick's rights which he had under the individual certificate of insurance. On its face it concedes that the

insured had not complied in strict detail with all of the requirements contained in the individual certificate relative to procuring a converted policy, but it pleads an equitable estoppel against the insurer as excusing the insured from such compliance. We conclude that the trial court committed no error in overruling the demurrer.

Plaintiff's second, third, and fourth assignments deal with alleged errors of the trial court in overruling demurrer to the evidence; in refusing to grant its request for a directed verdict, and in refusing to give certain requested instructions. All of these may be said to be based upon the insurer's contention that Bostwick had never terminated his employment with the automobile company, and for that reason never at any time became entitled to a converted policy of insurance. We find no error of the trial court in any of these assignments, for the reason that, under the theory of the beneficiary, it was not necessary to prove that Bostwick had actually quit, but that, being desirous of obtaining and perfecting his rights under the individual certificate, he was prevented from doing all things necessary to be done thereunder by the misrepresentations of the insurer's agent. There is no doubt that Abercrombie was a soliciting agent of the insurance company, with authority to procure applications for insurance and transmit them to his principal, the insurance company, which in turn wrote the policies and transmitted them to Abercrombie for delivery and collection of premiums.

As to the representations and statements made by the insurer's agent, Abercrombie, on February 24, 1928, we quote testimony as given by one of the employees of the automobile company, as follows:

"Q. Now I believe I will ask you to state the conversation as you remember it. A. Mr. Abercrombie represented at that time that there was going to be cancellation and expiration of our group policy, and through some ruling of the insurance company we were entitled to take out any policies that we wanted without medical examination; he also—that was the—solicitation was made to a group, they were told at the time—I think it was the first of March, that this old policy or the old policies would not be in force and that he wanted to get us all together at that time and get new policies for us. Mr. Bostwick asked him how much he could take out; he said 'That is up to you'; Mr. Bostwick says, 'Do you mean to say that I can take out $5,000?' and he said, 'Yes, you can take $5,000 without medical examination,' and that is what they agreed upon. Q. Did Mr. Bostwick do anything with reference to signing any application there? A. Yes, sir; he signed a blank application. Q. Did he fill out the application, or what did he do with that? A. He just simply signed the application. Q. Was the application in blank, or was it filled out? A. It was in blank. Q. Was anything said by the parties with reference to making out application, or how the policy should be obtained? A. Why, at the time Mr. Bostwick brought up the subject of medical examination, he in signing this told Mr. Abercrombie that he didn't want to fill it out, and Mr. Abercrombie says, 'That's all right; I will fill it out.' Q. Was anything said there with reference to whether this was being done in accordance with the provision of the group policy as to a converted certificate or converted policy? A. We were all under the impression that these new policies—Mr. Bridges: We move to strike the answer. The Court: Just tell what you did—just answer the question. (Question read.) A. Yes, sir. Q. What did Mr. Abercrombie say in that regard? A. Mr. Abercrombie said that the old policy being canceled, that we were entitled to take these new ones."

Another witness, testifying relative thereto, testified in part as follows:

"Q. Will you tell us what, as you remember it, that conversation was? A. Mr. Abercrombie came down there with the intention of furthering this insurance, as I understood it, at that time was being canceled by the company, and we were to have a carry over policy without any further medical examination. Q. You say 'carry over' policy? A. I mean the policy Greenlease-Moore, as I understood it, was canceled out, or was to be canceled out—I think it was to expire on the 15th of March, and this gentleman came down there with the intention of renewing these policies with the statement that it was a group policy and a certain number of employees would have to be taken in in order to get this rate, and these policies would be issued without medical examination if they were taken in a group. Q. In order to carry the terms, did he mention then that you were entitled to converted policies? A. Converted policies, yes, sir. Q. That is the term he used? A. Yes, sir. Q. Was there a conversation between he and Bostwick with reference to Bostwick obtaining a converted policy on the basis of his? A. Yes, sir. Q. Group certificate, being plaintiff's exhibit A? A. Yes, sir. Q. What did Abercrombie say to Bostwick in regard to that? A. Mr. Abercrombie explained the situation to Mr. Bostwick as to converted policy, and Mr. Bostwick looked up at him and asked him, he

said 'How much insurance can I take?' He said, 'Well, how much do you want?' and Mr. Bostwick said, 'Why, I would like to have as much as I can get;' he said, 'Will you write me $5,000 worth?' and he said 'Why, certainly.' He said 'Do you mean me?' kinda looked at him just as much as if he was personally questioning his physical condition at that time, and he said, 'Certainly, I can.' Mr. Bridges: We object to the opinion—The Court: Sustained. Q. What was the physical appearance of Bostwick at that time as to whether he was in good health or otherwise? A. Very bad."

And testifying further with reference to Bostwick signing the application at that time:

"Q. Did you hear anything said by Mr. Abercrombie to Mr. Bostwick with reference to signing it and as to whether he had to have any examination or not? A. That he could convert these policies that were expiring and that if a certain number of employees signed that he would give us a group rate on it, and was very anxious to get the policies signed up in order to get them in so they would be in effect by the 15th of March."

And on cross-examination:

"Q. Mr. Bottom, when Mr. Abercrombie was talking with this group of men about giving them another policy because the Greenlease-Moore Company was canceling the group policy, the policy that he spoke to this group about was a salary savings policy, wasn't it? What I am getting at, this conversation that Mr. Abercrombie had with this group of salesmen, he didn't tell them, did he, at the time that the insurance that he was going to issue was by reason of termination of employment or quitting the company, did he? A. Not that I understood, Judge: he was——as I understood, it was merely a termination of the original group policy in order to protect on enough down there with this new policy—it was a group conversion in order to protect the employees there with this new policy; it was being offered in order to protect them before this old one elapsed."

The evidence clearly shows that at the time Bostwick signed the application referred to in the testimony he was in extremely poor health, and that this was easily discernible from his appearance, and that the application was attached to the policy and made a part thereof, and that the answers to the questions therein contained were untrue; that, although the application contained numerous questions concerning the applicant's physical condition, the answers thereto failed to correctly disclose the same, but, on the contrary, would in-dicate that the applicant was in the best of health in all respects. The examining physician's certificate, which was made a part of the policy, also indicates that the applicant was in perfect health.

The several remaining assignments of error urged by plaintiff herein are sufficiently covered by our present discussion of what we conceive to be the gist of this entire controversy, and we have reached the conclusion that, if the evidence shown by this record is sufficient to establish an equitable estoppel against the defendant there is no error shown herein.

In Flesner v. Cooper, 62 Okla. 263, 162 P. 1112, we define the essential elements of such an estoppel as follows:

"The essential elements of an 'equitable estoppel' are: First, there must be a false representation or concealment of facts. Second, It must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice. The representation or concealment mentioned. may arise from silence of a party under imperative duty to speak; and the intention that the representation or concealment be acted upon may be inferred from circumstances. Case of Brusha et ux. v. Board of Education of Oklahoma City, 41 Okla. 595, 139 P. 298, L. R. A. 1916C, 233, distinguished."

Let us then examine the facts herein and apply this rule.

First, there must be a false representation or concealment of facts. In the instant case the insurer's agent told Bostwick that his present status as the holder of a certificate under the group insurance policy entitled him to a $5,000 converted policy of insurance, without a physical examination, and in effect assured him that the only thing necessary for him to do to obtain such a policy was to sign the blank application, which the agent said was a mere formality required by the insurance company to obtain such a converted policy.

Second, it must have been made with knowledge, actual or constructive, of the real facts. The fact that the agent filled in all of the answers contained in the application. which he procured Bostwick to sign in blank, clearly shows that the agent was familiar with the nature of the information which his principal desired before writing the policy which he had in

mind to deliver to the insured. The application contained a certificate of examination to be executed by a physician, and this certificate shows to have been duly executed on the same date by an examining physician, all of which was clearly within the knowledge of the insurer's agent, and clearly shows, in our opinion, that the agent at the time knew that his principal did not propose to write the policy without the necessity of a physical examination. If it may be said that the agent did not at the time have actual knowledge of whether or not Bostwick had terminated his employment with the automobile company, we think the fact that he affirmatively assured Bostwick as to his status as a holder of an individual certificate under the group policy of insurance, without making inquiry as to whether or not he had complied with all of the terms therein imposed, is sufficient to charge the agent with constructive knowledge as to this. The facts here, however, are sufficient to justify the conclusion that the agent was familiar with the provisions of the requirements of the individual certificate, and of the status of the insured as to whether or not he was still employed by the automobile company.

Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. The only evidence offered by the insurer in the trial of this cause was offered to show that Bostwick had not terminated his employment with Greenlease-Moore Cadillac Company. There is not a word of testimony in the entire record from which it may be said that Bostwick knew that the individual certificate of insurance which he held provided that he must terminate his employment with the automobile company before he would be entitled to a converted policy of insurance. There is no testimony of any character from which it may be concluded or inferred that Bostwick knew that the insurance company required or expected a physical examination before the issuance of the policy which the agent, Abercrombie, offered. There is no evidence that Bostwick knew or suspected that he had to do anything toward obtaining the policy which he did obtain, save and except to sign the application in blank, all as represented to him by the insurer's agent. If it may be said that the insured had the means of knowledge concerning the misrepresented facts; if, by reference to his individual certificate of insurance, or the application which he signed in blank, or to the completed policy when delivered, he could have

and would have informed himself of the misrepresentations of the agent, it is sufficient to say in answer thereto that it was not his imperative duty to do so. An apt discussion of this phase of the law is found at pages 515-516 of Vance on Insurance (2nd Ed.), wherein the eminent author says:

"Equitable estoppels can be best analyzed and their constituent elements determined by assuming fact situations typical of the two groups into which the cases involving estoppels usually fall. Again, we will assume that the agent acting for the insurer acts within the course of his employment, though it is not at all necessary that the particular wrongful acts done should have been authorized.

"Case I. P. has erected a building on leased land. He applies for insurance to cover the risk, giving the agent accurate information as to the title. The agent delivers a policy saying, 'Here is your policy, fully covering your risk,' and collects the premium payable for insurance of the kind applied for. P., acting as do a very large majority of ordinary prudent persons under similar circumstances, assumes that the agent has delivered the coverage asked for, and puts the policy in his safe without attempting to read it, knowing full well that he could not understand it if he did so. Therefore he does not learn until a fire loss occurs that the policy contains a condition that it shall be void if the building insured is on leased ground.

"Let us consider analytically Case I. We look in vain for the elements of waiver in any of the forms discussed above. There is no agreement before or at the time of the delivery of the written contract altering one of its terms, such as appears in the first two cases of waiver as stated. There is no offer, express or implied, by the insurer to make any such agreement, nor is there any acceptance by the confiding insured, who has here no actual knowledge of the existence of the offending condition. There is no evidence whatever of any meeting of the minds of the parties in any attempted modifying agreement, which, of course, could not be shown even if it had been made. We do find, however, all the elements of an estoppel against the insurer who seeks to take advantage of the breach of condition. The insurer has made a false statement of a material fact—that the policy validly covered the risk—knowing that it would be relied on. The insured relied on the statement, as he was privileged to do since he had no actual knowledge of its falsity, and his failure to read the policy was not such negligence as to impute knowledge to him. Being so misled he both acted, in paying the premium, and refrained from acting, in that he made

no further effort to secure insurance, both to his prejudice. There seems to be no reason whatever for not holding the insurer estopped to deny the truth of his representation, whether by words, as here, or by acts, as in the more usual case, that the policy was valid at its inception. And of course the parol testimony rule has no application to proof of estoppels, which are shown not to modify any provisions of the contract, but to prevent the insurer from saying that the policy which he had falsely asserted to be valid was really to his knowledge invalid all the time."

Again, at pages 524-525 in the same text, we find the following:

"But to deprive him of his claim of estoppel the insured's knowledge must be such as affects his conscience and negatives his good faith, that is, actual knowledge of the facts involved in the claim of estoppel or of such facts as put him on inquiry. Constructive or imputed knowledge is not sufficient. The mere fact that he has the means of learning the truth for himself does not deprive him of the privilege of relying upon the insurer's representation. Hence, while a general rule of law imputes to the insured knowledge of the terms of the policy which he accepts, such imputed knowledge does not negative his good faith in relying upon a representation made by the insurer as to the operative effect of such policy. Therefore it is no answer to the insured's claim that the insurer is estopped to deny that he is bound by the policy which he delivered as and for a valid contract, to say that he is presumed to know the terms of the policy or that he was not privileged to rely on the insurer's false representation when by reading the policy delivered he might have discovered the truth."

See, also, Federal Life Insurance Co. v. Whitehead, 73 Okla. 71, 174 P. 784; State Mutual Insurance Co. v. Green, 62 Okla. 214, 166 P. 105. In the instant case there are no peculiar or special circumstances shown from which we might conclude that it was Bostwick's duty to examine these instruments.

Fourth, it must have been made with the intention that it should be acted upon. We think the evidence admits of no other conclusion than that the agent, Abercrombie, made the representations which he made to Bostwick for no other purpose than to induce Bostwick to purchase a policy of life insurance such as was delivered to him.

Fifth, the party to whom it was made must have relied or acted upon it to his prejudice. It is apparent from the evidence here that Bostwick desired to preserve or take advantage of all of the rights to which he was entitled as the holder of the individual certificate of insurance under the group policy; that he desired to have all of the insurance which he would be able to obtain by reason thereof in the manner and within the terms of the proposition made to him by the insurer's agent. That he had certain rights to obtain a converted policy of insurance cannot be disputed. That this right was exclusively within his control is apparent It is proven that his physical condition was bad, and that he was anxious to retain all of the benefits which he then held by reason of the individual certificate of insurance then in force. Plaintiff in error says he had no rights under the individual certificate of insurance to obtain a converted policy until his employment with the automobile company had been terminated; that no rights thereunder accrued to him until the employment had ended while the policy was in force. We do not agree with this contention. At that time his right to quit work and obtain a converted policy cannot be denied. He had practically terminated his employment by reason of his extremely poor physical condition, and we think that, under the evidence here, it is reasonable to say that he would have so terminated the same without delay had he known that it was necessary to do so in order to obtain the benefits of the individual certificate then in force, and had it not been for the fact that the insurer's agent, Abercrombie, assured him that in his present status he was entitled to a converted policy of insurance for $5,000 without doing anything further than signing the blank formal application for such converted policy and paying the premium charged by the insurer. Such reliance by Bostwick upon the representations of the agent, and the action taken by him in good faith in complying with all the requirements of the insurer's agent, prevented his pursuing further his desire to retain and preserve the benefits which he then had under the certificate of insurance.

We therefore conclude, as shown by the foregoing analysis, that the evidence herein contained all of the elements of an equitable estoppel against the insurer.

We conclude, further, that in such circumstances the agent, Abercrombie, at the time of the representations to Bostwick herein discussed, was working within the scope of his employment, and that his acts had and done within the purview of this case are binding upon his principal. Fed-

eral Life Insurance Co. v. Whitehead, supra; State Mutual Insurance Co. v. Green, supra. In Vance on Insurance, pp. 534-535, it is said:

"In deciding the ever present question of the effect of limitations in the application and policy upon the agent's authority to bind the insurance company which employs him, the distinction between waiver agreements and equitable estoppels is again of the first importance. As has been shown in the preceding chapter, such proper limitations as are communicated to the insured are binding and enforceable in all cases involving waivers; but it must be clearly kept in mind that limitations upon the agent's power to bind the insurer in contract have no necessary application to his acts alleged to create an estoppel, for in that respect the agent is not making agreements for his principal, but is serving him ministerially, doing acts which the principal has undertaken to perform. If therefore the acts of the agent alleged to create an estoppel were done in the course of his employment, in the conduct of his principal's business, the principal is legally bound by them even though they were not authorized or even though they were expressly forbidden. Nor, as stated before, will the law give effect to an express agreement in the contract that the insurer shall not be estopped by the fraud or other misdeeds of his agent committed in the transactions incident to the negotiation of the contract. The rule may be summarily stated as follows: In testing the binding quality of waivers, the courts determine whether the acts of waiver were within the apparent scope of the agent's authority. With regard to acts alleged to raise an estoppel, the question is whether such acts were done in the course of the agent's employment."

The judgment of the lower court is, therefore, affirmed.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, ANDREWS. McNEILL. OSBORN, and BAYLESS, JJ., concur. BUSBY, J., absent.