LIBERTY NATIONAL BANK & TRUST
COMPANY, a national banking asso-
ciation, Appellant,

v.

BANK OF AMERICA NATIONAL
TRUST & SAVINGS ASSOCIATION, a
national banking association, Appellee.

BANK OF AMERICA NATIONAL
TRUST & SAVINGS ASSOCIATION, a
national banking association, Cross-Ap-
pellant,

v.

LIBERTY NATIONAL BANK & TRUST
COMPANY, a national banking asso-
ciation, Cross-Appellee.

Nos. 4855, 4856.

United States Court of Appeals,
Tenth Circuit.

Jan. 15, 1955.

Rehearing Denied Feb. 11, 1955.

V. P. Crowe and John W. Swinford, Oklahoma City, Okl. (Embry, Crowe, Tolbert, Boxley & Johnson, Oklahoma City, Okl., on the brief), for appellant and cross-appellee.

Richard W. Fowler, Oklahoma City, Okl. (Kenneth M. Johnson, San Francisco, Cal., and Cochran, Dudley, Fowler, Rucks, Baker & Jopling, Oklahoma City, Okl., on the brief), for appellee and cross-appellant.

Before BRATTON, HUXMAN and PICKETT, Circuit Judges.

BRATTON, Circuit Judge.

This is an action instituted by Bank of America National Trust and Savings Association, hereinafter referred to as Bank of America, against Liberty National Bank and Trust Company, hereinafter referred to as Liberty National, to recover judgment upon two commercial drafts, or in the alternative, judgment for such lesser sum as it might be entitled to under the facts alleged in the complaint.

Bank of America is engaged in the banking business at San Francisco, California, and Liberty National is engaged in a like business at Oklahoma City, Oklahoma. The controversy between the parties arose out of a certain commercial letter of credit issued by Liberty National to Bank of America, a like letter of credit issued by Bank of America to

Union Bank of Switzerland, hereinafter referred to as Bank of Switzerland, and the acts occurring thereafter in relation to a transaction involving the purchase of certain oil well casing and tubing and the shipment thereof from Antwerp, Belgium, to Houston, Texas. Anderson-Prichard Oil Corporation, hereinafter referred to as the Anderson-Prichard Company, negotiated with a broker in San Francisco to purchase the casing and tubing then located in Europe. It became necessary for the Anderson-Prichard Company to furnish a letter of credit covering the amount of the purchase price. Liberty National furnished the letter of credit under date of December 15, 1950. The letter was amended several times. As finally amended, it expressly obligated Liberty National to honor upon presentation drafts drawn on that bank not to exceed in the aggregate $480,749.00, provided certain documents were attached to the drafts, and provided the drafts were negotiated on or before March 31, 1951. The letter provided that it was issued against the shipment of a specified quantity of described casing and tubing meeting American Petroleum Institute specifications; that partial shipments were to be permitted; that all material shipped should be inspected by Moody & Company or Lloyd's agent; that a certificate of inspection should accompany all drafts; that a specified type of insurance should accompany the drafts; that ocean freight, insurance, duties, and taxes, if any, should be paid by the seller from funds which the Bank of America should derive from the broker and payment of such charges should be evidenced by vouchers attached to each draft; that drafts must be accompanied by a full set of clean on board ocean bills of lading evidencing shipment from foreign port to Houston and must also be accompanied by commercial invoices, consular invoices, and railroad weight certificates; that the drafts must bear on their face certain language indicating that they were drawn under the letter of credit; that shipments thereunder must be made not later than March 20, 1951; and that the expiration date of the letter of credit was March 31, 1951. Relying upon the letter of credit issued to it by Liberty National, Bank of America issued to Bank of Switzerland its letter of credit for the benefit of the seller of the casing and tubing. That letter of credit was dated December 20, 1950, and it was amended from time to time to correspond to the amendments made in the letter issued by Liberty National. In particular, it called for the same documents to accompany drafts drawn thereunder as did the letter of credit issued by Liberty National. Within a few days after the issuance of the two letters of credit, Bank of America wrote Liberty National outlining the procedure which would be followed in handling the negotiations under the credit. It was stated in the letter that upon receipt from Bank of Switzerland of the drafts and documents called for in the letter of credit, Bank of America would pay the drafts drawn by the seller of the merchandise and would procure from the broker vouchers covering the duties which would be paid in Houston; and that it would then have the broker draw drafts on Liberty National, would attach to such drafts the documents called for in the letter of credit, and would forward such drafts to Liberty National for payment. And it was further stated that, in addition to the amount of the drafts, Liberty National would be requested to remit an amount of one-eighth of one per cent of such drafts which would constitute the commission due Bank of America. By prompt reply, Liberty National stated that the plan outlined for handling the negotiations was acceptable.

Subsequently, the broker, Bank of America, Liberty National, and the Anderson-Prichard Company learned that in order to effect shipment of the casing and tubing it would be necessary to make payment therefor in Europe before the materials moved. The broker talked with Blake, assistant cashier of Bank of America; the broker also talked on long distance telephone with Rodman, presi-

dent of the Anderson-Prichard Company; Rodman and Blake talked on long distance telephone; and after these conversations, Liberty National—with the approval of the Anderson-Prichard Company—sent to Bank of America a telegram in which it was stated among other things that Liberty National authorized payment in Geneva on receipt of cable advice from Bank of Switzerland that it held the documents required by the letter of credit issued by Bank of America to Bank of Switzerland, but with rail weight certificate instead of mill weight certificate and American Petroleum Institute monogram waived. Upon receipt of such telegram, Bank of America cabled the Bank of Switzerland in part that "upon receipt your authenticated cablegram advising amount negotiated quantity shipped credit terms met we will reimburse you accordance your instructions." And Bank of America informed Liberty National that it had advised Bank of Switzerland that payment would be made upon such cable advice from the latter bank. On February 2, 1951, Bank of Switzerland cabled Bank of America. The latter construed the cablegram to mean that the former held the documents required by the letter of credit and to request that the account of the former with the latter be credited with $90,834.15; Bank of America credited the account of Bank of Switzerland with that amount; and on the same day it advised Liberty National that payment had been made for the materials included in the first shipment. A representative of the Anderson-Prichard Company inspected the shipment upon its arrival in Houston. The inspection disclosed the fact that at least some of the casing and tubing was not new but was used or secondhand, and for that reason acceptance was refused. On February 27, Bank of Switzerland dispatched a second cablegram to Bank of America. The latter construed the communication to mean that the former held the documents called for in the letter of credit for a second shipment of casing and tubing and to request that its account be credited with the sum of $51,640.70; and the credit was given. The second shipment was not accepted by the Anderson-Prichard Company. Bank of America caused the materials to be sold, and the net proceeds of the sale amounted to $120,249.05. Bank of America forwarded to Liberty National two drafts drawn upon the latter, one based upon the first shipment and the other upon the second; and their payment was refused.

The trial court determined that Bank of America was not entitled to recover from Liberty National upon the two drafts. But the court further determined that, independently of the drafts, Liberty National was liable to Bank of America for the amounts in the aggregate which the latter credited to the account of Bank of Switzerland, less the net amount derived from the sale of the casing and tubing, 116 F.Supp. 233. Taking into consideration adjustments about which there is no dispute, that amount was $49,296.60, for which judgment was entered. Both parties appealed.

■ Liberty National urges that entry of the judgment against it constituted reversible error. It is said in support of the contention that the finding of the trial court that Liberty waived the receipt of the documents called for in the letter of credit by authorizing payment upon cable advice is contrary to the evidence and to the interpretation which the parties placed upon the agreement. The clear import and meaning of the telegram which Liberty National sent to Bank of America under date of December 29, 1950, was that Liberty National authorized Bank of America to make payment to Bank of Switzerland upon receipt of cable advice from Bank of Switzerland that it had in its custody the documents required by the letter of credit. By the telegram Liberty National agreed to entrust to Bank of Switzerland the function of determining that it had in its possession for transmittal to Bank of America the required documents, and it authorized Bank of America to make payment to Bank of

Switzerland upon cable advice that the latter bank had such documents in its possession. As understood by those experienced and skilled in international banking, the two cablegrams which Bank of Switzerland sent to Bank of America each meant that Bank of Switzerland had received and then held in its custody for transmittal the documents required by the letter of credit; that Bank of Switzerland had made payment for the merchandise; and that Bank of America was requested to reimburse Bank of Switzerland. And it was upon receipt of such cablegrams that Bank of America credited the account of Bank of Switzerland with the respective amounts. While the telegram which Liberty National sent to Bank of America authorizing payment in Geneva did not contain an express promise, commitment, or obligation to reimburse Bank of America for its payment or payments to Bank of Switzerland, the right to reimbursement arose upon the making of such payments and Liberty National became impliedly obligated to Bank of America for the amounts so paid to Bank of Switzerland. Scott v. Norton Hardware Co., 4 Cir., 54 F.2d 1047; Kennedy v. Conrad, 91 Mont. 356, 9 P.2d 1075; Treece State Bank v. Wade, Mo.App., 283 S.W. 714.

■ Liberty National argues that the parties did not construe the telegram to which reference has been made as creating an obligation on the part of Liberty National to reimburse Bank of America for the amounts which it paid to Bank of Switzerland. Certain events occurring after the sending of the telegram are relied upon to sustain the contention. Bank of America did cable Bank of Switzerland that when the documents were presented it was to advise concerning any discrepancies and await instructions; it did request an extension in the expiration date fixed in the letter of credit issued by Liberty National; it did communicate with Liberty National respecting the documents required; it did communicate with Liberty National in respect to payment of the duties and wharfage charges; it did

exert an effort to obtain and present to Liberty National the documents required by the original letter of credit; and it did not make formal demand that Liberty National reimburse it for the amounts paid to the Bank of Switzerland pursuant to the terms of the telegram. It is the law in Oklahoma that where a contract is ambiguous or of doubtful meaning, the practical construction which the parties placed upon it over a long period of time will be adopted although its language may be susceptible of another construction. McDowell v. Droz, 179 Okl. 119, 64 P.2d 1210; Joachim v. Board of Education of Walters, 207 Okl. 248, 249 P.2d 129. But the telegram in question was free from ambiguity or uncertainty, and the acts and conduct on the part of Bank of America did not tend to negate the obligation on the part of Liberty National to reimburse Bank of America for the amounts it paid to Bank of Switzerland pursuant to the authority contained in such telegram.

■ Liberty National makes the further argument that the telegram referred to did not create any liability on its part to reimburse Bank of America for the amounts paid to Bank of Switzerland for the reason that Blake agreed with Rodman that the telegram would be meaningless so far as the Anderson-Prichard Company was concerned, and that Liberty National would not be liable for any amounts unless and until all of the terms and conditions of the original letter of credit were met and fulfilled. There was testimony that Rodman and Blake talked on long distance telephone soon after it was learned that payment in Europe for the casing and tubing was necessary; that in the course of the conversation Rodman asked Blake what that meant; that Blake stated it did not mean anything so far as the Anderson-Prichard Company was concerned; and that Liberty National and Anderson-Prichard Company would have an opportunity to examine the documents required by the original letter of credit before being obligated to pay anything to Bank of America. But these statements were in con-

flict with the clear meaning and effect of the telegram, and they were made before the telegram was dispatched. The telegram was free from ambiguity. It constituted an obligation on the part of Liberty National to reimburse Bank of America for the amounts paid to Bank of Switzerland. And, absent accident, mutual mistake, or fraud, the previously made oral statements in conflict with such telegram could not vary or neutralize its legal effect. Jordan v. Hall-Miller Drilling Co., 10 Cir., 203 F.2d 443; Hicks v. Mid-Kansas Oil & Gas Co., 182 Okl. 61, 76 P.2d 269; Investors Royalty Co. v. Lewis, 185 Okl. 302, 91 P.2d 764.

Liberty National makes the further argument that the statements which Blake made to Rodman in the course of the long distance telephone conversation estop Bank of America from contending that the telegram authorizing payment in Geneva obligated Liberty National to reimburse Bank of America for the amounts paid to Bank of Switzerland. In Oklahoma, the essential elements of an ordinary equitable estoppel are the making of a false representation or concealment of facts; the making of such representation or concealment with knowledge, actual or constructive, of the real facts; the party to whom the representation was made or from whom the facts were concealed must have been without knowledge, or means of knowledge of the real facts; the false representation must have been made or the facts concealed with the intention that the victim would act thereon; and the party to whom the representation was made or from whom the facts were concealed must have relied and acted thereon to his prejudice. The representation or concealment may arise from silence of a party under duty to speak, and the intention that the representation or concealment be acted upon may be inferred from the circumstances. Flesner v. Cooper, 62 Okl. 263, 162 P. 1112; Gypsy Oil Co. v. Marsh, 121 Okl. 135, 248 P. 329, 48 A.L.R. 876; Equitable Life Assurance Society of United States v. Case, 167 Okl. 119, 28 P.2d 571. Estoppel may also be effectuated where a party does or omits to do something which he intends or should reasonably expect to influence the action of the other party, and the other party relies and acts thereon to his prejudice. Yates v. American Republics Corp., 10 Cir., 163 F.2d 178. Blake did not make any false representation respecting any material fact. The Anderson-Prichard Company and Liberty National were familiar with the terms of the two letters of credit, and they knew that payment in Europe had been demanded. Blake explained what payment by cable meant, said that so far as the Anderson-Prichard Company was concerned it did not mean anything, said that payment would be made in Switzerland for the account of Bank of America, said that he was perfectly willing to rely upon Bank of Switzerland to handle the transaction properly, said that the papers required by the letter of credit would be transmitted by air mail and would be in Oklahoma City two or three days after payment was made in Geneva, and said that they would be at Liberty National long before the ship arrived. The statements made were in essence merely an explanation of the meaning of payment by cable transfer, an expression of opinion that Bank of Switzerland was trustworthy, an expression of opinion that payment in Europe then being demanded did not mean anything as far as the Anderson-Prichard Company was concerned, and a forecast that the required documents would be available to the Anderson-Prichard Company for examination before the shipment of casing and tubing arrived in Houston. And after dispatching the telegram authorizing payment in Geneva, Liberty National did not change its position to its prejudice in reliance upon such explanation and expression of opinion. We fail to find any sustainable basis for the contention that the explanation, expression of opinion, and forecast constitute an effective estoppel of Bank of America to now urge that the telegram authorizing payment to the Bank of Switzerland and the making of such payments created

a legal obligation on the party of Liberty National to reimburse Bank of America.

■ Liberty National makes one further contention. It is that Bank of America did not make final payments to Bank of Switzerland; that the payments were made by bookkeeping entries which were subject to adjustment when Bank of America learned that the documents delivered to Bank of Switzerland did not comply with the requirements of the letter of credit issued to the latter bank. Liberty National expressly authorized Bank of America to make payment to Bank of Switzerland upon receipt of cable advice that Bank of Switzerland had in its custody the documents called for in the letter of credit. Immediately upon receipt of the two cablegrams from Bank of Switzerland that it had such documents in its custody, Bank of America credited the account of Bank of Switzerland with the requested amounts, respectively. That conformed to the established custom and practice by which banks make payments, one to the other. The credits did not constitute bookkeeping entries. They constituted payment of the funds to Bank of Switzerland. Liberty National had not recalled or countermanded its authorization to Bank of America to make payment to Bank of Switzerland, and Bank of America was under no duty or obligation to reverse by bookkeeping entries the payments previously made to Bank of Switzerland.

■ Bank of America predicates error upon the refusal of the court to enter judgment in its favor upon the first draft drawn upon Liberty National. The draft was accompanied by a bill of lading, commercial invoices, an inspection certificate, and rail weight certificates. But no consular invoice was furnished. The printed bill of lading used by the shipping company contained the words "Received in apparent good order and condition" but the words "in apparent good order and condition" were stricken therefrom. At a different place the words "ship not responsible for kind and condition of goods" were inserted. The words "ship not responsible for rust" were stamped in the body of the document. And the rail weight certificates required by the letter of credit and accompanying the draft bore on their face language referring to the casing and tubing as being used or secondhand. The letter of credit issued by Liberty National expressly required in clear language that any and all drafts drawn thereunder should be accompanied by a full set of clean on board ocean bills of lading. As we understand it, the general rule is that the term "clean on board ocean bills of lading", as used in the letter of credit, means a bill or bills of lading which does or do not indicate by deletion, addition, or otherwise, that the merchandise or commodity being shipped is not in apparent good condition. The Isla De Panay, 2 Cir., 292 F. 723, affirmed 267 U.S. 260, 45 S.Ct. 269, 69 L.Ed. 603; Thomas Roberts & Co. v. Calmar S. S. Corp., D. C., 59 F.Supp. 203; Givaudan Delawanna, Inc., v. The Blijdendijk, D.C., 91 F. Supp. 663. Viewed in the light of that general rule, it is manifest that, in respect to a substantial requirement, the bill of lading which accompanied the draft was not a clean bill of lading within the intent and meaning of the letter of credit and therefore Liberty National was not obligated by the letter of credit to honor the draft upon its presentation. Wells Fargo Nevada National Bank of San Francisco v. Corn Exchange National Bank, 7 Cir., 23 F.2d 1; Crocker First National Bank of San Francisco v. De Sousa, 9 Cir., 27 F.2d 462, certiorari denied 278 U.S. 650, 49 S.Ct. 94, 73 L.Ed. 561; Moss v. Old Colony Trust Co., 246 Mass. 139, 140 N.E. 803.

■ Bank of America advances the further contention however that in any event Liberty National is liable under the law of Oklahoma for the face amount of the first draft because of its failure for more than twenty-four hours after the presentation thereof and the unqualified demand for its payment either to pay the same or to return it to Bank of America, not accepted. It is the well established

law in Oklahoma that a bank which neglects, fails or refuses to return a draft drawn upon it within twenty-four hours after the delivery of such draft to it, or within the further period of time allowed by the holder to the drawee, is deemed to have accepted the draft and its liability is measured accordingly. American National Bank of Ardmore v. National Bank of Claremore, 119 Okl. 149, 249 P. 424; First State Bank of Talihina v. Black Bros. Co., 187 Okl. 124, 101 P.2d 802.

 Bank of America transmitted the draft to Liberty National by mail. It was accompanied by a letter of transmittal, dated February 24, and a remittance schedule bearing the same date. The letter stated in substance that the draft was drawn in conformity with the credit terms; that arrangements had been made with a bank in Houston to pay all duties and wharfage charges; that when such duties and charges had been paid, the bank in Houston would obtain a delivery order in favor of the Anderson-Prichard Company, would wire Liberty National to that effect, and would solicit its instructions; and that the broker had informed Bank of America that once such formalities had been accomplished and the documents transmitted with the draft were in possession of the Anderson-Prichard Company, the president of that company would authorize Liberty National to transfer by wire to Bank of America the amount of the draft, plus the commission due Bank of America. And the letter concluded with the statement that Bank of America looked forward to receiving the funds during the early part of the following week. Inasmuch as it was clearly implied in the letter of transmittal that presentment of the draft for payment was not to take place until Liberty National was advised by the bank in Houston that all duties and wharfage charges had been paid, and that receipt of the funds was expected during the early part of the following week, the requirement under the law of Oklahoma that Liberty National either accept the draft or return it not accepted or be held to have accepted it did not begin to run until Liberty National received from the bank in Houston assurance that the duties and wharfage charges had been paid, or until it received from Bank of America the unqualified telegraphic demand for payment. On Thursday, March 1, the bank in Houston sent by mail to Liberty National a copy of its letter to Bank of America in which it was stated that the duties and port charges had been paid, and that in accordance with instructions received from Liberty National the shipment would be handled as directed by the Anderson-Prichard Company. On Saturday, March 3, at 11:54 a.m., Western Union Telegraph Company received at its office in Oklahoma City a telegram from Bank of America to Liberty National making unconditional demand for payment of the draft. While the evidence and the inferences to be drawn therefrom presented some inconsistency and conflict, the trial court found that the vice president of Liberty National handling the transaction did not receive from the bank in Houston assurance that the duties and wharfage charges had been paid until sometime after the bank opened for business on Monday, March 5th; and that the telegram which Bank of America sent to Liberty National under date of March 3rd was not received by the vice president of Liberty National until sometime after the bank opened for business on Monday, March 5th. On March 5th, Bank of America telegraphed Liberty National repeating the request for payment of the draft. The vice president of Liberty National conferred with Rodman and with the attorney for the bank, and on Tuesday morning, March 6th, he sent a telegram to Bank of America advising that the papers presented were not complete in accordance with the terms of the letter of credit; that the papers which were presented showed on their face that the materials shipped did not conform to the specifications contained in the letter of credit; and that the draft was being returned. And by letter of

the same date, the draft was returned. The burden rested upon Bank of America to show that Liberty National failed for more than twenty-four hours after the presentation of the draft for payment and the unqualified demand for such payment either to accept the same or to return it unaccepted. Having failed to discharge that burden, Bank of America was not entitled to judgment upon the draft for failure of Liberty National to accept or return it unaccepted within the time specified by the law of Oklahoma or be deemed to have accepted it.

 Bank of America challenges the action of the court in refusing to enter judgment in its favor upon the second draft drawn upon Liberty National. The draft was drawn on April 11, 1951. The letter of credit provided that all drafts drawn thereunder must be negotiated on or before March 31, 1951, and that such date was the expiration date of the letter. But it is urged that the letter of credit contained an inconsistency; that although it required drafts to be drawn on or before March 31, 1951, it also required payment of duties and taxes before Liberty National would be obligated to pay such drafts; that obviously such duties and taxes could not be paid until the ship carrying the materials docked at Houston and the amounts had been determined; that if the ship should dock later than March 31, 1951, it would be impossible to negotiate the draft covering the shipment before the expiration date fixed in the letter of credit; that the vessel carrying the second shipment did not arrive at Houston until April 12, 1951; and that by reason of such inconsistency contained in the letter of credit, Liberty National is estopped to deny that the draft was negotiated within the time allowed. The purpose of a written agreement is to evidence the terms upon which the minds of the contracting parties meet when they enter into it. The primary function of judicial interpretation is to ascertain and give effect to the intention of the parties as expressed in their writing. And the

basic rule of universal acceptation for the ascertainment of such intention is for the court, so far as possible, to put itself in the place of the parties when their minds met upon the terms of the agreement, and, taking into consideration the writing itself, its purpose, and the circumstances leading up to and attending its execution, endeavor to ascertain what the parties purposed and intended by their agreement. Where the language contained in an agreement is contradictory, obscure, or ambiguous, or where the meaning of an agreement is doubtful, so that the contract is fairly susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally enter into, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the former interpretation must be preferred to the latter. Pressed Steel Car Co. v. Eastern Railway Company of Minnesota, 8 Cir., 121 F. 609; A. Leschen & Sons Rope Co. v. Mayflower Gold Mining & Reduction Co., 8 Cir., 173 F. 855, 35 L.R.A.,N.S., 1; National Products Co. v. Magnolia Petroleum Co., 175 Okl. 596, 53 P.2d 669. And a construction which renders a contract possible of performance will be preferred to one which renders its performance impossible or meaningless. E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 89 A.L.R. 238, certiorari denied 290 U.S. 646, 54 S.Ct. 64, 78 L.Ed. 561. But the intention of the parties, when manifest or when ascertained by appropriate means of construction, must control and be enforced.

 The provision contained in the letter of credit that March 31, 1951, should be the expiration date of such letter, and that all drafts drawn thereunder must be negotiated before such date, was free from doubt, obscurity, or ambiguity. Its meaning was crystal clear. And where a date is fixed in a letter of credit for its expiration, such provision becomes an important condition, and there must be strict compliance with it

before there can be liability on the part of a bank issuing the letter. This draft was drawn after the expiration date fixed in the letter of credit and therefore Liberty National was not obligated by the letter to honor the draft. Barde Steel Products Corp. v. Franklin National Bank, 3 Cir., 281 F. 814; G. Jaris & Co. v. Banque D'Athenes, 246 Mass. 546, 141 N.E. 576.

The judgment is affirmed.

PICKETT, Circuit Judge (dissenting).

I respectfully dissent from that part of the majority opinion which affirms the judgment against Liberty. The trial court rightfully held that the drafts sued upon by Bank of America were not in conformity with the letter of credit, and that Liberty was not required to pay them. However, it held that Liberty, separate and apart from liabilities arising out of the letter of credit and the drafts drawn thereunder, is liable to Bank of America for the latter's payments to the Union Bank of Geneva, Switzerland. This holding is based upon a telegram of Liberty which authorized the payments to be made by the Swiss bank.[1]

Liberty's dealings were entirely with Bank of America, which was servicing the transaction for a commission. The latter was experienced in the handling of foreign financial transactions and employed experts for this purpose. It advised Liberty prior to the sending of the telegram in question that payment in Switzerland would not in any way affect the requirements of its letter of credit. It advised the president of Anderson-Prichard Company that it would not be required to pay until it had an opportunity to examine the required documents, as they would be flown to Liberty immediately after receipt. This is the construction the parties put upon the effect of the telegram and it should control. McDowell v. Droz, 179 Okl. 119, 64 P.2d 1210; Lackey v. Ohio Oil Co., 10 Cir., 138 F.2d 449; Simon v. H. F. Wilcox Oil & Gas Co., 10 Cir., 123 F. 2d 25.

It is inescapable from all the evidence that Bank of America, Liberty, and Anderson-Prichard understood this, as no request for payment was made until the documents were delivered to Liberty. The Bank of America had the identical requirements in its letter of credit to the Swiss bank, still, upon cable notice, it credited the account of the Swiss bank with the payments which it had made without examining the required documents and without notifying Liberty that such credits were being made. Thereafter, the Bank of America never took the position that Liberty was obligated to pay the credits before it had had an opportunity to determine the sufficiency of the documents.

The evidence is without conflict that it was not the intention of either the Bank of America, Liberty, or Anderson-Prichard that there should be changes in the conditions of the letter of credit except that payment was to be made in Geneva rather than San Francisco. Admittedly, the conditions of the letter of credit were not complied with. The effect of the trial court's holding is that not only was the place of payment of the money changed by the telegram, but all the other protection carefully set forth in the letter of credit was eliminated. The Bank of America gave credit to the Swiss bank without requiring it to comply with the conditions of the letter. It alone dealt with the Swiss bank and it alone could require compliance with its letter of credit to that bank before payment. It alone could have protected it-

---

1. The pertinent portion of this telegram reads:

"Re our letter of credit dated December 15, 1950.

"Authorize payment Geneva on receipt of cable advice from Union Bank of Geneva, Switzerland, that they hold documents required your letter to them December 20, 1950, but with rail weight certificate instead of mill weight certificate and API monogram waived."

self from loss caused by the default. It is my opinion that the telegram of December 29, 1950, did not, and was not intended to, relieve Bank of America of its responsibility to produce the documents required by the letter of credit before it could require payment from Liberty. When the transaction is considered as a whole, it appears to me that the trial court required the wrong party to suffer the loss by giving a strained meaning to the words of the telegram.

I would reverse the judgment against Liberty.